[Civ. No. 17612. First Dist., Div. One. Mar. 27, 1958.]

MARIA K. GREGERS, Individually and as Executrix, etc., Respondents, v. PETERSON ICE CREAM COMPANY, INC. (a Corporation), Defendant; MILK PRODUCERS ASSOCIATION OF CENTRAL CALIFORNIA (a Co-operative Association), Appellant.

Nathan B. McVay and C. O. Thrasher, Jr., for Appellant.

Wells, Murphey & Coffey for Respondents.

BRAY, J.—In an action for declaratory relief plaintiffs obtained judgment against defendant Milk Producers Association of Central California for $1,196.32 and attorneys' fees of $1,500, and that said defendant take nothing by reason of its cross-complaint. Defendant Peterson Ice Cream Company, Inc., was awarded judgment that plaintiffs take nothing against it. Defendant Milk Producers* appeals.

QUESTIONS PRESENTED

1. Did defendant assume the obligations of the contract between plaintiffs and Peterson? If so, was another agreement substituted?

2. Is the amount of the judgment correct?

3. Are plaintiffs entitled to attorneys' fees?

1. *Assumption of Contract.*

December 31, 1950, plaintiffs and defendant Peterson entered into a contract by which, for a period of five years, plaintiffs were granted certain territory in which to sell Peterson's frozen dairy products and in which plaintiffs agreed to buy and Peterson to supply to plaintiffs said products at fixed prices. A conditional sales contract for sale to plaintiffs of certain equipment was included. Plaintiffs paid

---

*As used herein, defendant "Milk Producers" refers to Milk Producers Association of Central California.

in full the purchase price of the equipment and both parties had complied with the terms of the contract up to February 19, 1954. On that date Peterson entered into an agreement with defendant effective March 1 by which Peterson sold defendant ''free from all liabilities and encumbrances'' the ice cream and ice cream products business owned by it, including the good will of the business, all customer lists, merchandise, specified personal property, trade accounts receivable, inventory, and ''all other personal property'' (except certain moneys). A bill of sale was executed at the same time describing the business and property as in the agreement of sale with specific listing of equipment and fixtures. A clause stated that the seller represented that all of the property was free and clear of all liens and encumbrances, except listed accounts payable and taxes. The Gregers' contract was not specifically mentioned. The agreement and bill of sale provided that Peterson would not engage in the ice cream business in Northern California. This restriction included the area given plaintiffs in their contract with Peterson. The controversy is whether Peterson and Milk Producers intended that the Gregers' contract be assigned to and its obligations accepted by Milk Producers. For the first month after the contract went into effect (March) plaintiffs were charged the contract price. Thereafter plaintiffs were billed at a new price. There is a conflict in the evidence as to whether the conduct of the parties thereafter constituted an acceptance by plaintiffs of the new prices or an insistence by plaintiffs that they were standing on their contract rights and were paying Milk Producers C.O.D. charges under protest in order to continue in business. Likewise there was a conflict in the evidence as to whether or not it was the intention of Peterson and Milk Producers that the Gregers' contract be assigned and its obligations accepted. The evidence, although not overwhelming, substantially supports the court's findings that it was not only the intention of the parties that the Gregers' contract was to be assigned to defendant but also that defendant agreed to perform its terms. We do not deem it necessary to detail the evidence. Suffice it to say that there was evidence that Milk Producers negotiated with Peterson to purchase its going business and to hold all its customers and accounts, and knew of the Gregers' contract; that Milk Producers performed a contract made between Peterson and the Veterans' Administration and also two other contracts which like the Gregers' contract were not specifi-

cally designated in the sale agreement; that Milk Producers performed the Gregers' contract for one month after the sale became effective; that prior to the sale plaintiffs when informed by Peterson and his office manager Ellis of the proposed sale referred to his contract and was told by Ellis that he was staying on as manager for Milk Producers and that everything would go on as usual. There was a clause in the agreement by which Peterson was concluded from thereafter competing with Milk Producers in the territory covered by the Gregers' contract, which made it impossible for Peterson thereafter to perform the Gregers' contract. Milk Producers purchased all of the assets of the Peterson business except the real property (this, of course, would include the Gregers' contract); both by the terms in the contract "all customer lists," "all other personal property," and by transfer of the good will of the business, the Gregers' contract was necessarily included. (See *Pecarovich* v. *Becker,* 113 Cal.App.2d 309, 311 [248 P.2d 123], holding that purchase of "all other assets" of a ball club included an unmentioned coaching contract.) Peterson testified that in his negotiations with the general manager of Milk Producers the Gregers' contract was discussed although not shown, that it was regarded as an important part of the good will and that the manager wanted the busines kept intact; that Peterson did not specifically mention the assumption of the contract by Milk Producers since the manager was interested in taking over a going concern as a whole and was not particularly interested in going into the details of all contracts or any individual contract, but was impressed with the fact that the Gregers and the three other contractors were sewed up. Significant circumstances are that the Veterans' Administration contract assumed by defendant had fixed prices and that defendant claimed that it and the two other contracts assumed by it had been expressly assigned but the assignments were never produced. The agreement of sale provided "Seller, up to date of closing, will operate and maintain its business in regular course and *will not violate the terms of any contract connected with its business.*" (Emphasis added.) In *Stevens* v. *Selma Fruit Co., Inc.,* 18 Cal.App. 242 [123 P. 212], there was a situation somewhat similar to that here. The contract by which the new corporation was to take over the business of the old corporation, as a "going business" (and the agreement of sale in our case provided that the business was to be sold to defendant "as a going concern"), contained a pro-

vision to the effect that the old corporation would operate the business until the new corporation could take it over. The court there said that this provision among other matters indicated that it was intended that the new corporation should not only take over all the properties of the old corporation but also assume its obligations and contracts. Here there was testimony which would have supported conclusions that Milk Producers did not know of or intend to accept the obligations of the Gregers' contract. It was the province of the trial court to, and it did, resolve this conflict in favor of plaintiffs.

Here there was evidence from which it could be concluded that Milk Producers knew of the obligation of the Gregers' contract. In any event, the evidence clearly shows they should have known of them. They, at the very least, knew that Gregers were customers of Peterson and in purchasing Peterson's business they were obligated to make some inquiry, if they had not already been told, to learn the terms under which Gregers were on Peterson's list of customers. Actually, the price for the good will of the business was based upon certain prices per gallon of the Peterson sales for the preceding year, which sales defendant's auditor checked.

Of course, it is the general rule that the mere assignment of rights and benefits under an executory contract does not impose on the assignee the obligations of the assignor unless the assignee consents to the assumption of the obligation. (*Griffin* v. *Williamson*, 137 Cal.App.2d 308, 315 [290 P.2d 361].) However, whether there has been an assumption of the obligations is to be determined by the intent of the parties as indicated by their acts, the subject matter of the contract or their words. (*Jegen* v. *Berger*, 77 Cal. App.2d 1, 6 [174 P.2d 489].) The circumstances here support the court's finding that defendant intended to and did assume the obligations of the Gregers' contract and then when it found that its rigid price schedule made it somewhat unprofitable, tried to keep plaintiffs as customers but at a higher price. Section 1589, Civil Code, provides: "A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." While *Armstrong Co.* v. *Shell Co. of Cal.*, 98 Cal.App. 769 [277 P. 887], held that that section only applied to a person who was a party to the original transaction, *Weidner* v. *Zieglar*, 218 Cal. 345 [23 P.2d 515], referred to the Armstrong case as distinguishable on its facts, referred to

three cases in California holding that the application of the section was not limited to parties to the original transaction, and stated "We might multiply considerably the authorities to the same effect as the first three discussed, but no useful purpose would be served." (P. 351.) It then held liable the assignee, although not a party to the original obligation, because of his acceptance of the benefits of the contract. (See also *Bergin* v. *van der Steen*, 107 Cal.App.2d 8, 19 [236 P.2d 613], similarly applying section 1589, and Witkin, Summary of California Law, 6th ed., p. 180.)

Defendant contends that assuming that it agreed to the obligations of the contract, a new agreement or agreements were made substituting the new prices demanded by defendant. As stated before, defendant for the first month after it took possession of the Peterson business billed plaintiffs at the contract rate. Defendant contends that it did so because it had not discovered that the Gregers' contract contained a rigid price schedule. The Gregers' contract was in the Peterson safe along with other documents and the safe and its contents were taken possession of by defendant on March 1 although there is no evidence that any employee of defendant except Ellis, who was Peterson's office manager until the transfer and then became defendant's, saw it there. On April 1, plaintiffs were notified that from then on they would be billed at a changed rate. Plaintiffs protested that they had a contract and expected defendant to live up to it. From then on defendant billed plaintiffs at the changed rates. At the time of the transfer plaintiffs owed Peterson some $5,700. Defendant wanted this money paid. There is a conflict in the evidence as to whether plaintiffs agreed to pay a specific amount each week on this indebtedness or merely what they could. As plaintiffs were billed at the new rate they would figure out what the contract rate was and send a round sum to defendant which they intended to include the weekly bill and a payment on the old. On October 23, 1955, defendant wrote plaintiffs that thereafter, in order that they continue to supply plaintiffs, all products would be billed C.O.D. on defendant's price list and that all orders received by plaintiffs would be accepted on the basis of that list. Plaintiffs immediately replied to the effect that they would insist upon their rights under the contract and the price schedule provided therein but would pay under protest on the C.O.D. basis for the balance of the contract period and would hold Peterson, "its successors and assigns, responsible

for any damages'' plaintiffs suffered. These facts do not constitute the making of a new contract or contracts. Defendant had plaintiffs over the proverbial barrel. To keep in business plaintiffs had to have products and as defendant had required Peterson to keep out of the area in which plaintiffs were located, the logical place to get the products was from defendant, to pay defendant's prices under protest and through the courts to maintain plaintiffs' rights under the contract. As a practical matter plaintiffs were benefiting defendant by minimizing the damages defendant would be required to pay if the court should hold, as it did, that defendant was obligated under the contract. The evidence is clear that at all times plaintiffs were insisting upon their rights under the contract, continuing to dispute with defendant, and complied with defendant's terms, if at all, under protest. There never was any meeting of minds between the parties on any new contract or contracts. For the same reasons, there was never any agreed, executed, oral modification of the written contract. *D. L. Godbey & Sons Const. Co.* v. *Deane,* 39 Cal.2d 429 [246 P.2d 946], is not in point. There there was an orally agreed change of basis of computation entered into between the parties before performance was started, the court holding that substitution of new rights and duties based upon the new method of computation and the additional duty of the plaintiff to provide daily reports was adequate consideration for the relinquishment of the reciprocal rights under the written contract. In our case performance under the written contract had started and defendant did no more than it was required to do under the contract. Moreover, the evidence supports the conclusion that plaintiffs by accepting defendant's products and paying the invoice price, if they did pay it,* still did not agree to defendant's contentions. While defendant seemed to put the situation on a ''do it my way or not at all'' basis, plaintiffs always insisted upon their contract rights. Defendant contends that the language in the sale agreement that the seller shall sell ''free from all liabilities and encumbrances (except as hereinafter provided)'' and in the bill of sale, the seller's representation that all of the property ''is free and clear of all liens and encumbrances,

---

*In defendant's exhibit B-2 (the new account which ran from May to December, 1955), it appears that while plaintiffs no longer, as theretofore, paid in round figures, plaintiffs based their payments on the contract rate, so that in the first two weeks of that account there was a difference of over $1,000 between what plaintiffs paid and the charges made by defendant. At one time this difference rose as high as $2,632.20.

save and except the amounts payable hereinabove referred to'' and taxes already a lien, necessarily excludes the Gregers' contract which was not specifically mentioned in either document. To hold that ''liabilities and encumbrances'' means the obligations in a reciprocal executory contract under the circumstances here would be a distortion of the English language. Moreover, defendant itself by its action in the Veterans' Administration contract matter as well as its first month's operation under the Gregers' contract did not so interpret the terms.

Defendant cites authorities on estoppel (*Wilson* v. *Bailey,* 8 Cal.2d 416 [65 P.2d 770], and others) and contends that plaintiffs accepted deliveries on its price schedule thereby creating an estoppel with each delivery, as stated in the cases cited. Estoppel requires a change of position relying upon a representation by the other party. At no time did plaintiffs represent that they would accept defendant's price schedule other than under protest and while insisting upon their rights under the contract. There was no estoppel.

2. *Amount of the Judgment.*

The amount of the judgment in plaintiffs' favor and the refusal to award defendant any sums on its cross-complaint were based upon the figures supplied by plaintiffs. Defendant first contends that the bulk-ice cream price was not applicable to the Sealrite ½-gallon ice cream containers but that the package price should have been applied. Evidence was introduced to the effect that in the trade ½-gallon containers were generally considered as package ice cream and bore the package rate. However, the evidence also showed that at all times during the existence of the Gregers' contract prior to its assignment to defendant, plaintiffs and Peterson had interpreted the rate applying to Sealrite ½-gallon containers (but not to other brands) to be the bulk rate and not the package rate. This was for the purpose of inducing plaintiffs to accept and sell the Sealrite product. ''. . . successors in interest are bound by the construction reasonably given contractual terms by the original parties.'' (See *Doll* v. *Maravilas,* 82 Cal.App. 2d 943, 949 [187 P.2d 885], and 12 Cal.Jur.2d 328.) For the first month after the transfer defendant gave the same construction to the contract.

Defendant contends that it was improper to correlate the ice cream prices with the prices of butter on the wholesale market in San Francisco. The contract so provides. While

defendant objected to this correlation when the price of butter fell below 60 cents, it objected and thereby prevented plaintiffs from showing that while plaintiffs received the benefit of the effect of 60 cent butter, defendant actually received the benefit of the effect of butter going above 75 cents.

Defendant further contends that the payments made by plaintiffs after the first month constituted an executed oral agreement to take its products at the rate billed after the first month. We have heretofore disposed of that contention by showing that there never was such an agreement.

### 3. *Counsel Fees.*

 The Gregers' agreement provides that reasonable attorneys' fees are recoverable by the successful party ''if it becomes necessary for either party hereto to employ an attorney to enforce any of the terms, covenants, or conditions in this agreement.''* The court found that it was necessary for plaintiffs to institute legal proceedings to determine the rights and liabilities of the parties under the contract. Defendant states that it does not quarrel with this finding but contends that it is not a finding that the attorney was necessary to ''enforce any of the terms . . . in this agreement.'' It is obvious that an action to declare defendant bound by the contract which it expressly repudiated is an action to enforce the contract. Moreover, plaintiffs were required to set up the contract as a defense to defendant's cross-complaint and in obtaining a judgment against defendant on it they were successful in enforcing the terms of the contract. The finding was sufficient and amply supported.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

---

*Defendant does not contend that the amount awarded was unreasonable.