[Civ. No. 24292.   Second Dist., Div. Three.   Apr. 19, 1961.]

CITY OF VERNON, Plaintiff and Appellant, v. SOUTHERN CALIFORNIA EDISON COMPANY (a Corporation), Defendant and Appellant.

Darling, Shattuck & Edmonds, Hugh W. Darling, Vincent R. Poxon and Donald K. Hall for Plaintiff and Appellant.

O'Melveny & Myers, Pierce Works, William D. Moore and Rollin E. Woodbury for Defendant and Appellant.

FORD, J.—By its complaint the city of Vernon sought to quiet title to certain real and personal property described as constituting the Vernon electric system and to recover possession thereof, together with damages, from the Southern California Edison Company. The defendant, hereinafter called Edison, filed its answer and, in addition, a cross-complaint under which it sought a declaratory judgment as to the rights and duties of the parties under their agreement with respect to the property involved.

The nature of the controversy can be made apparent by a résumé of the facts found and the legal conclusions of the trial court with respect thereto. Such summary is as follows:

1. Edison is a public utility corporation which is subject to the regulatory and rate-making powers of the Public Utilities Commission (formerly known as the Railroad Commission) of the State of California, and is engaged in a general electric business in certain parts of the state. 2. Since its incorporation as a municipal corporation, Vernon has been principally an industrial community; its area is approximately 4 square miles; it is located in the heart of the Los Angeles industrial area. 3. Prior to June 1933, Edison owned and operated an electrical distribution system in Vernon and was the sole distributor of electricity in Vernon; the electric rates in force in Vernon were higher than the rates then charged for the same or similar service on the system of the Department of Water and Power (formerly known as the Bureau of Power and Light) of the City of Los Angeles, a municipally owned and operated utility not subject to the regulatory or rate-making powers of the Public Utilities Commission. 4. In June 1933, Vernon put into operation its own generating plant and transmission and distribution system; from that time until May 1937, Vernon and Edison competed in the sale of electricity in the city of Vernon; by the end of 1936, Vernon was doing approximately 60 per cent of the electric business in Vernon while Edison was doing approximately 40 per cent of such business; Vernon was considering the installation of additional generating facilities because the then generating capacity of its plant had been absorbed. 5. In June 1933, Vernon placed in effect on its system rate schedules which were the equivalent of those then in force for the same or similar service in the city of Los Angeles; Edison thereupon reduced its rates to the level of Vernon's rates; until on or about November 9, 1957, rates in Vernon remained on a parity with the Los Angeles rates and were, on the average, approximately 25 per cent lower than the rates in effect for the same or similar service on other parts of Edison's system under Edison's general system rates; since on or about November 9, 1957,[1] the electric rates in force in Vernon have exceeded the Los Angeles rates and have been equal to the rates in effect for the same or similar services on other parts of Edison's system under Edison's general system rates. 6. On February 23, 1937, Vernon and Edison entered into an

[1]The importance of this date in the light of the agreement of February 23, 1937, between Vernon and Edison will hereinafter be noted.

agreement which, on May 10, 1937, Edison was authorized by the Railroad Commission to execute and carry into effect.[2] 7. Pursuant to the agreement between Vernon and Edison, Edison transferred to Vernon its electric system in Vernon, with certain exceptions, and that system was combined with Vernon's system by Edison; furthermore, under the agreement Vernon leased the combined system to Edison for a term of 10 years ending May 29, 1947, with the option vested in Vernon to extend the leasehold term for successive periods of 10 years. 8. Since May 29, 1937, Edison has been in possession of, and has been operating, the combined system and all component parts thereof, including the alterations, extensions, additions and betterments, made from time to time, to which reference is hereinafter made. 9. Edison's total investment in the distribution facilities which were transferred to Vernon pursuant to the basic agreement was $58,000 before accrued depreciation; Edison's cost of connecting the two systems was $569,178; Vernon's total investment in its system at the commencement of the agreement, before accrued depreciation, was $3,787,554.62, and was financed through the

[2]In section 31 of the agreement it is stated: ''This agreement shall not be effective until it has been approved by the Railroad Commission of the State of California.''

In the decision of the Railroad Commission of May 10, 1937, it was said in part: ''The agreement contains a condition subsequent which provides that the City of Vernon can terminate said agreement at any time when the Edison Company in the City of Vernon charges rates higher than its rates on other portions of the Edison System within Los Angeles County, or higher than the rates of the Department of Water and Power of the City of Los Angeles for similar service. In the event of the termination of the agreement because of the breach of this condition, the Edison Company will receive no compensation for the properties it is now transferring to the City of Vernon. If the agreement is not renewed by the City of Vernon at the end of a 10-year period, the Edison Company, is entitled to reimbursement for its expenditures on account of properties transferred to the City less accrued depreciation on such properties. . . . Thus, while the City transfers possession of its plant to the Edison Company, it does so only upon condition that its rate policy be maintained.''

The order of the commission was as follows:

''It Is HEREBY ORDERED that Southern California Edison Company Ltd. be, and it is hereby authorized to execute and carry into effect an agreement similar in terms to the agreement filed in this proceeding as Exhibit A, provided nothing contained in such agreement nor in this decision shall by the Edison Company, its successors or assigns or by any one else, be held to limit the Commission's authority from ordering and directing said Southern California Edison Company Ltd., its successors or assigns, from charging in said City of Vernon rates for electric service which are higher or lower than the rates provided for in said agreement,''

sale of general obligation bonds of the city of Vernon; after the agreement was in operation Edison paid the principal and interest on such bonds as part of the rentals reserved in the lease. 10. Vernon exercised its option to extend the leasehold term for a period of 10 years ending May 29, 1957; in 1956, it exercised its option to extend the leasehold term for another period of 10 years ending May 29, 1967. 11. Pursuant to the agreement, from time to time Edison made and installed alterations, extensions, additions and improvements in and to the combined system and transferred title thereto to Vernon. 12. In section 5(c) of the agreement of February 23, 1937, it is provided that if Edison shall, at any time during its possession of the leasehold property, establish or maintain or continue in effect in the city of Vernon, for a period longer than 15 days, electric rates or charges for service that are higher than any rates or charges for the same or similar services on the system of the Department of Water and Power of the City of Los Angeles, then Vernon may, at its option, terminate the leasehold term and repossess the leasehold property, including all extensions, additions, alterations or improvements to the leasehold property made or installed by Edison, free and clear of any of the terms of the lease and of any claims of Edison therein or thereto. 13. Such provision of section 5(c) was intended to apply and was understood and accepted by the parties as applying to any increase in electric rates in Vernon above the level of rates in the city of Los Angeles for the same or similar service, whether such increase was ordered by the Public Utilities Commission or otherwise; maintenance of Vernon's policy of having electric rates in Vernon which were not in excess of the Los Angeles rates was the primary motivation for Vernon's entering into the agreement of February 23, 1937; if such policy was not or could not be maintained by Edison, it was the intention and understanding of the parties that Vernon would be entitled to repossess the leasehold property. 14. Prior to 1952, the last general rate increase sought by Edison was granted in 1921; in 1952, Edison applied to the Public Utilities Commission for a general rate increase throughout its system, but requested that any authorized increase be permissive rather than mandatory in Vernon; in 1954, the Public Utilities Commission authorized and directed a system-wide increase in rates except that in Vernon Edison was authorized but not ordered to increase rates, but in

fixing the level of the new rates the commission computed the revenues for rate-making purposes as though the new rates were in effect in Vernon; no increase in rates in Vernon occurred. 15. In 1956, Edison applied to the Public Utilities Commission for another general rate increase throughout its system; while Edison informed the commission of its unsuccessful efforts to obtain Vernon's consent to an increase of rates under the 1954 order, Edison made no request that any increase in Vernon rates that might be authorized be permissive rather than mandatory; on October 15, 1957, the commission ordered Edison to increase its rates in Vernon and, pursuant thereto, on November 9, 1957, Edison increased its rates in Vernon with the result that such rates were higher that the rates charged for the same or similar service by the Department of Water and Power of the City of Los Angeles. 16. On December 19, 1957, Vernon served on Edison a notice in which it was stated that Vernon elected to, and did, exercise its right and option under section 5 of the agreement to terminate the leasehold term and to repossess the leasehold property. 17. In section 13 of the agreement of February 23, 1937, it is provided that at the end of the leasehold term, or at the end of any additional leasehold term resulting from the exercise of the renewal option by Vernon, and provided the lease shall not have been sooner terminated in accordance with the provisions of section 5 of the agreement, Vernon shall pay Edison:

(a) the reasonable cost of the material, equipment and structures constructed or installed by Edison in combining the Vernon electric system and the Edison electric system;

(b) the reasonable cost of Edison's electric system which Edison granted, transferred, assigned and set over to Vernon in 1937; and

(c) the reasonable cost of all alterations, extensions, additions and improvements made or installed by Edison during its possession under the lease;

deducting in each case certain costs and, also, accrued depreciation upon the items mentioned in (a), (b) and (c), set forth above, according to the formula set forth in section 13. 18. Vernon has never tendered or paid to Edison any sums under such terms of section 13 of the agreement. 19. *"The provision of said Section 13 which purports to relieve Vernon of the obligation to compensate Edison for the leasehold property granted, transferred, assigned and set over to Vernon by Edison by*

*reason of the termination in accordance with the provisions of Section 5 of the Agreement, constitutes an unenforceable penalty. The provisions of Section 5(c) of the Agreement of February 23, 1937, are not, in and of themselves, unlawful, unenforceable, or violative of public policy. The provisions of said Section 5(c), to the extent to which the same purport to allow Vernon to repossess the leasehold property without payment of compensation as provided in Section 13, constitute an unenforceable penalty. The loss or threatened loss of such compensation tended to, and did in fact, deter Edison from the performance of its duties to the public as a public utility to take all steps and to perform all acts necessary to be performed on its part to insure that the rates charged and collected by it within the City of Vernon, pursuant to order or approval of the Public Utilities Commission, should at all times be just and reasonable."* (Emphasis added.) 20. The difference between the gross revenue received by Edison for the sale of electricity in Vernon under the rates prescribed by the 1957 order of the commission and the gross revenue which Edison would obtain under rates comparable to the rates charged for the same or similar service by the Department of Water and Power of the City of Los Angeles was, commencing on November 9, 1957, the sum of $187,000 per month. 21. Eleven per cent of the aforementioned sum of $187,000 per month is attributable and allocable to the distribution system operated by Edison in Vernon, but that system includes the leasehold property and, in addition, facilities, equipment and properties owned and used by Edison to serve two particular industrial users; the balance of the sum of $187,000 per month "is attributable and allocable to the operations of facilities owned and operated by Edison in its own right, free and clear of any claims or rights of Vernon, to wit: Edison's own generating facilities outside the City of Vernon, and transmission facilities operated by it in the ordinary course of its business as a public utility." 23. "The reasonable value of the use and occupation of the leasehold property from and after December 19, 1957, to the date of judgment herein is an amount equal to the rent reserved in the Present Agreement, and, in addition thereto, 5⅓% of the aforementioned amount of $187,000 per month."[3] The determination

---

[3]It is to be further noted that the trial court determined that even if Edison's possession after December 19, 1957, was wrongful, "as to

to use $5\frac{1}{3}$ per cent of $187,000 as the proper basis was reached by deducting from the base of 11 per cent, heretofore mentioned, one-third thereof as being attributable and allocable to the revenues derived from the two customers serviced by facilities, equipment and property not a part of the leasehold property, and by deducting from the 11 per cent an additional 2 per cent of the gross revenues because such 2 per cent "is already being and at all times since May 29, 1937 has been paid by Edison to Vernon as part of the rentals reserved in the lease." 24. The costs of that portion of the leasehold property which Edison transferred to Vernon under the agreement, less an allowance for depreciation calculated in accordance with the formula set forth in section 13 of the agreement, totaled as of December 19, 1957, $3,653,876.57, and "in the absence of other evidence as to reasonable value," that amount represents as of that date "the reasonable value of said portion of the leasehold property." Such costs and reasonable value as of April 30, 1959,[4] amounted to $3,540,758.91. 25. The reasonable value of the services rendered by the attorneys for Vernon in the preparation and prosecution of this action is the sum of $35,063.75, which Edison is obligated to pay to Vernon under the terms of the agreement.[5]

The judgment was, in part, that Vernon is the owner of the property involved and, upon payment to Edison of the sum of $3,540,758.91, is entitled to possession of the property, free and clear of all claims of Edison, but that Edison is entitled to retain possession until such sum is paid. In addition, judgment was given in favor of Vernon for $398,963.16. Such amount was determined as follows:

"An amount equal to the net unpaid rentals as reserved in the said lease, computed for the period December 19, 1957 to the present time .............................$188,379.71

which the Court finds and concludes to the contrary," the amount of damages measured by the reasonable value of the use and occupation of the leasehold property from that date to the date of judgment would be in the same amount because the amount would be calculated in the same manner as above.

[4]The judgment was entered on June 8, 1959.

[5]Section 27 of the agreement of February 23, 1937, is as follows: "Edison agrees that in the event any suit or proceedings are brought to enforce or interpret any of the terms and conditions of this agreement it will, in the event any judgment in favor of Vernon is entered in such suit or proceedings, pay to Vernon a reasonable attorneys' fee to be fixed by the court in said action or proceeding."

"5⅓% of $187,000 per month for the period
December 19, 1957 to the present time....$175,519.70
"Reasonable value of services rendered by
attorneys for Vernon..................$ 35,063.75

Total........$398,963.16"

Vernon appeals from the judgment insofar as it is thereby required to pay Edison the sum of $3,540,758.91 before obtaining possession and having its title quieted to the property involved and insofar as it provides for a money judgment for only $398,963.16, except that Vernon raises no issue as to the sum of $35,063.75 awarded to it as attorneys' fees. Edison appeals from the judgment insofar as it relates to the termination of Edison's rights to continue to operate the Vernon system under the agreement and insofar as it orders judgment for any amount in excess of unpaid net rentals reserved in the agreement.

It is Edison's contention that the trial court erred in holding that the provisions of section 5(c) as to the termination of the leasehold are valid and enforceable. It is asserted that the condition subsequent therein embodied constitutes an attempt by Vernon to regulate the rates to be charged by a public utility in that it is predicated entirely upon the maintenance of rates by Edison at a specified level. It is true, of course, that the sole authority to determine and regulate the rates of a public utility for service furnished by it rests in the Public Utilities Commission (formerly designated as the Railroad Commission). (Cal. Const., art. XII, § 23; Pub. Util. Code, §§ 454, 728, 729; see *Pacific Tel. & Tel. Co.* v. *City of Los Angeles,* 44 Cal.2d 272, 280 [282 P.2d 36].) But a municipality may engage in the business of supplying persons within its territory with electricity from electric works constructed and operated by it, as Vernon formerly did, without subjecting itself to the jurisdiction of the Public Utilities Commission as to its rates for service. (*City of Pasadena* v. *Railroad Com.,* 183 Cal. 526 [192 P. 25, 10 A.L.R. 1425]; see *Polk* v. *City of Los Angeles,* 26 Cal.2d 519, 539-540 [159 P.2d 931].) In its action as to the approval of the agreement of February 23, 1937, the Railroad Commission's jurisdiction existed only by virtue of the fact that there were involved properties of Edison and an agreement on Edison's part with respect to the supplying of electricity. (*Water Users & Tax-*

*payers Assn.* v. *Railroad Com.*, 188 Cal. 437, 442-444 [205 P. 682].) But, aside from the effect of the proviso contained in the commission's order with respect to the agreement which has been quoted hereinabove, the agreement was subject as a matter of law to the plenary authority of the Public Utilities Commission to order Edison to increase its rates in Vernon. (See *Pinney & Boyle Co.* v. *Los Angeles Gas & Elec. Corp.*, 168 Cal. 12, 18 [141 P. 620, Ann.Cas. 1915D 471, L.R.A. 1915C 282].)

In the light of the applicable law, we turn to the language of section 5 of the agreement which Edison asserts to be invalid and unenforceable. That language is: "Said lease is made on the following conditions subsequent, upon the happening of any one of which, at the option of Vernon, to be exercised by service of written notice upon Edison within the period of thirty (30) days thereafter, the leasehold term herein granted shall cease, and Vernon shall be entitled to repossess the leased property. . . . (c) If Edison shall, . . . establish, or at any time for a period longer than fifteen (15) days maintain or continue in effect . . . within the present corporate limits of Vernon, any electric rates or charges for service that are higher than any rates or charges for service for the same or similar service on the system of the Department of Water and Power of the City of Los Angeles, . . ." It is clear that the provision embodies solely a condition subsequent and involves no covenant or promise on the part of Edison to maintain rates. (See *Knight* v. *Black*, 19 Cal.App. 518, 522 [126 P. 512]; 3 Williston on Contracts [rev. ed.], §§ 665, 670, 671.) Such a covenant, if one had been made, would, of course, not be enforceable in the face of an order of the Public Utilities Commission that Edison increase its rates in Vernon (see *Sutter Butte Canal Co.* v. *Railroad Com.*, 202 Cal. 179, 187 [259 P. 937] (aff'd, 279 U.S. 125 [49 S.Ct. 325, 73 L.Ed. 637]); *Law* v. *Railroad Com.*, 184 Cal. 737, 739 [195 P. 423, 14 A.L.R. 249]; *Limoneira Co.* v. *Railroad Com.*, 174 Cal. 232, 238 [162 P. 1033]), but there still remains the question of the validity and enforceability of the condition subsequent.

It is obvious from the record in this case that at all times since 1933 it has been the purpose of Vernon to assure users of electricity within its highly industrialized area that the rates therefor would not be higher than those of the Depart-

ment of Water and Power of the City of Los Angeles.[6] To achieve that purpose it had established its own system. Such purpose was a lawful one. It did not become unlawful when Vernon entered into the agreement of February 23, 1937, with Edison, although that purpose was thereby made subordinate to the authority of the Public Utilities Commission to order Edison to increase its rates in Vernon. However, no provision of law or public policy prohibited a provision for the termination of such an agreement when Vernon's purpose could no longer be lawfully achieved because of the order of the commission. The parties could lawfully contemplate the happening of that contingency and agree upon its consequences. (*Cf. Goldberg* v. *Callender Bros.*, 96 Conn. 182 [113 A. 170, 171]; *Orme* v. *Atlas Gas & Oil Co.*, 217 Minn. 27 [13 N.W.2d 757, 760-761].) Such was the sole effect of section 5 under the facts in the present record, aside from the effect of the portion thereof, hereinafter to be discussed, which is in the words, "free and clear of any of the terms of the lease and of any claims of Edison." Since the contract by its terms provided for an option for termination upon the occurrence of the event being discussed, there is no basis for a claim that any performance was made unlawful by reason of the 1957 order of the Public Utilities Commission and that the condition itself was thereby rendered void and unenforceable. Nor did such order make compliance with the condition subsequent impossible; on the contrary, it brought into being the event upon which, at the option of Vernon, the operation of the

[6]In the preamble of the agreement of February 23, 1937, such purpose is expressed as follows: "THAT, WHEREAS, Vernon owns and operates within its corporate limits an electric generating plant and an interconnected electric transmission and distribution system for the purpose of supplying said City and its inhabitants with light, heat and power, and has established and is continuously maintaining a policy of fixing rates and charges for such service so that they shall be at least as low as rates and charges covering the same or similar service in effect on the electric system of the Department of Water and Power of the City of Los Angeles, or any part thereof, or on the electrical system of Edison within the County of Los Angeles, or any part thereof, including any incorporated territory within said County; and . . .

"WHEREAS, Edison desires to lease from Vernon and upon the terms and conditions hereinafter stated, including the continued maintenance of the policy of Vernon hereinabove referred to of fixing rates and charges for service, Vernon is willing to lease to Edison, the present properties of Vernon herein described, together with the material, equipment and structures to be constructed and/or installed by Edison as hereinafter provided and the properties of Edison granted, transferred, assigned and set over to Vernon pursuant to the terms hereof: . . ."

electric system by Edison was to cease. A return of the operation of an electric system to a municipality under such circumstances involves no conflict with the applicable law.

Any conclusion other than that reached by the trial court would mean that while Vernon's objective could no longer be achieved, Edison would still retain the use of Vernon's property for the remainder of the 10-year period. In *Law* v. *Railroad Com., supra,* 184 Cal. 737, the contract to which the public utility succeeded was one under which steam and electricity were to be furnished at certain rates for a period of 20 years for the purposes of heating, power, and illumination in a building in the city of San Francisco. The party contracting to furnish such steam and electricity was granted the right, under the agreement, to use parts of the building and premises, including certain improvements, free of charge. Thereafter the Railroad Commission made an order which, in effect, abrogated the provisions of the contract as to rates. The Supreme Court said, at pages 741-742: "If the order attempted to change the rate paid by petitioner and, at the same time, give the power company the right to continue to use the agencies and appliances of petitioner under the contract, then it would, indeed, exceed the jurisdiction of the commission by depriving petitioner of his property without compensation and due process of law. This, however, is not the effect of the order, which simply does what the law permits, namely, fixes the rates to be paid by the consumer, and, therefore, nullifies the compensation fixed by the contract. It follows, of course, in view of the change effected by the order in such an important part of the contract, that petitioner will have the right under the law to rescind the contract, and prevent further use of his property by the former company, except for compensation properly determined."

Vernon attacks the determination of the trial court that the provisions of sections 5 and 13 of the agreement which purport to allow Vernon to repossess the leasehold property without payment of compensation constitute an unlawful penalty and cannot be enforced in law or equity. It is to be noted that section 13 provides in substance for the payment by Vernon to Edison of the costs to Edison of the property embodied by Edison in the system, subject to certain deductions, such payment to be made "at the end of the leasehold period therein fixed, . . . or at the end of any additional leasehold term resulting from the exercise of the option pro-

vided for in the preceding section, and provided the option for further renewal shall not have been exercised, and provided the lease shall not have sooner terminated in accordance with the provisions of Section 5. . . .'' Under the terms of section 5, grounds of such termination in addition to the one specifically involved in the present litigation are:

''(a) If Edison shall fail to make when due any of the payments hereinabove provided, and such failure shall continue for a period of ten (10) days after written notice of such failure shall have been served on Edison by Vernon.

**''(b) If Edison shall . . . establish, or at any time main**tain or continue in effect . . . within the present corporate limits of Vernon, any electric rates or charges for service which shall be higher than any rates or charges for service . . . for the same or similar service in effect concurrently on any other portion of the system of Edison . . . within the County of Los Angeles, or any part thereof . . .

''(d) If Edison shall fail to promptly observe and perform any other term, condition, covenant or agreement herein provided to be kept, observed or performed by Edison, and **any such failure shall continue for a period of forty-five (45)** days after written notice thereof has been served by Vernon upon Edison.''

It is to be noted that aside from the situation defined in section 5(b), which is of the same nature as section 5(c), the grounds of termination relate to matters over which Edison itself has control. The provisions of (b) and (c) relate to matters as to which the action of Edison is subordinate to the authority and order of the Public Utilities Commission. The effect of a provision for the loss of payment it would otherwise receive[7] upon the termination of the agreement, if such termination results from the event described in section 5(c), is to bring pressure to bear upon Edison to cause it to refrain from performing its duties as a public utility to the extent that such performance is affected by its operations

---

[7]It is to be noted that, under section 5, upon the happening of a contingency therein specified and the exercise of its option by Vernon, it is provided that ''the leasehold term herein granted shall cease.'' We interpret such cessation to mean that thereby there is brought into being ''the end of any additional leasehold term'' as such language is used in section 13, if, insofar as section 5(c) is concerned, no force or effect is to be given to that portion of section 13 which is as follows: ''and provided the lease shall not have been sooner terminated in accordance with the provisions of Section 5 hereof.''

in Vernon.[8] Undue pressure imposed on Edison to induce it to maintain rates even at the expense of its public duties to others, whether such pressure was effective at the time of the making of the agreement or became so in the light of later circumstances, cannot be given legal sanction. (See *Gibbs* v. *Consolidated Gas Co. of Baltimore,* 130 U.S. 396, 410 [9 S.Ct. 553, 32 L.Ed. 979]; *Custer Public Power Dist.* v. *Loup River Public Power Dist.,* 162 Neb. 300 [75 N.W.2d 619, 628].) Consequently, those provisions of the agreement which purport to require Edison, upon termination thereof under the circumstances disclosed in the present record, to forfeit payment it would otherwise receive upon the termination of the agreement cannot be enforced. Their substance consists of coercion, contrary to clearly expressed public policy, exercised against Edison by a device in the nature of a forfeiture. ■ The form in which such device is found is not determinative of its true nature, for, as said by the Supreme Court in *Ebbert* v. *Mercantile Trust Co.,* 213 Cal. 496, at page 499 [2 P.2d 776]: "A penalty need not take the form of a stipulated fixed sum; any provision by which money or property would be forfeited without regard to the actual damage suffered would be an unenforceable penalty."

---

[8]In its opinion of October 15, 1957, the Public Utilities Commission said in part:

"The Commission has carefully considered the positions taken by the applicant and the City of Vernon. We find as a fact

"(a) That the rates charged by applicant to its customers located in the City of Vernon are depressed far below a reasonable level.

"(b) That said rates produce an unreasonable and inadequate return to applicant which results in either applicant or its other customers subsidizing the customers of applicant in Vernon.

"(c) That there are industries served by applicant which are in competition with industries in Vernon, the former of which industries are required to pay substantially higher rates than similar industries in Vernon; thus creating unreasonable and unlawful prejudice to and discrimination against industries located outside of Vernon and unreasonable and unlawful preference to and discrimination in favor of industries located in Vernon. Furthermore, these depressed rates charged by applicant in the City of Vernon constitute prejudice to and discrimination against customers of applicant outside of but similarly situated and comparable to customers in Vernon, contrary to the public interest.

"(d) That said rates charged by applicant to customers in Vernon constitute an unreasonable and unlawful burden upon the other customers of applicant and, also, upon applicant.

"(e) That for applicant to continue to charge these depressed rates would have a direct tendency to disable applicant in the full performance of its public duty.

"(f) That said rates and the unreasonable and unlawful burden which they create are contrary to the public interest and such burden should be removed in order that the public interest be protected."

██ Vernon had recourse to the jurisdiction of equity for the purpose of quieting its title and seeking possession of the electrical system. ██ "An action to quiet title involving equitable issues is governed by equitable principles." (*Gavina v. Smith,* 25 Cal.2d 501, 505 [154 P.2d 681].) ██ Since Vernon had a duty to pay Edison pursuant to the terms of section 13 without regard to the provision as to the effect of termination under section 5, it was proper to require such payment as a condition to the relief sought by Vernon. Such condition was consistent with the terms of the agreement. (See *Crystal Amusement Co.* v. *Potter Title & Trust Co.,* 281 Pa. 47 [126 A. 185, 186-187]; *cf. National Waterworks Co.* v. *Kansas City,* 62 F. 853, 864; *Gardner* v. *Samuels,* 116 Cal. 84, 88-89 [47 P. 935, 58 Am.St.Rep. 135].)

██ Even though Edison did not withhold possession wrongfully as long as Vernon failed to pay the sum due Edison under section 13 of the agreement, it is obvious that the manner of compensating Vernon for the use of its property which governed while the agreement was in full force and effect can no longer be fairly applied under the changed circumstances which resulted in substantially greater revenue to Edison.[9] To permit Edison to use Vernon's property in the interim without awarding to Vernon the reasonable value of the use and occupation thereof would result in the unjust enrichment of Edison. ██ As said in *Major-Blakeney Corp.* v. *Jenkins,* 121 Cal.App.2d 325, at pages 339-340 [263 P.2d 655]: "It is fundamental, of course, that the gravamen of a quasi-contractual action grounded on unjust enrichment is the equitable principle that a person should not be allowed to enrich himself at the expense of another. (*Lazzarevich* v. *Lazzarevich,* 88 Cal.App.2d 708 [200 P.2d 49]; *Miller* v. *Schloss,* 218 N.Y. 400 [113 N.E. 337]; 17 C.J.S., Contracts, pp. 322-325; Woodward, The Law of Quasi Contracts, p. 9.) ██ It presupposes the acceptance and retention of a benefit by one party with full appreciation of the facts, under circumstances making it inequitable for the benefit to be retained without payment of the reasonable value thereof. (17 C.J.S., Contracts, pp. 332 et seq.)" ██ The manner in which the trial court made its determination of such reasonable

---

[9] One of the conclusions of law in the present case is: "Equity and good conscience require that Edison pay Vernon the reasonable value of the use and occupation of the leasehold property from and after December 19, 1957 to and including the date of judgment herein."

value has been set forth hereinabove. Such determination was fair and reasonable and we can find no fault with it. Some guidance in reaching this conclusion is found in *City of San Diego* v. *Southern Calif. Tel. Corp.*, 42 Cal.2d 110, wherein it was said at page 124 [266 P.2d 14]: "It is necessary, therefore, to determine how to apportion gross receipts between the distributing system and the other operative property of the company. In our opinion, a reasonable method is to allocate gross receipts by the ratio that the company's investment in its distributing system in the area bears to its total investment in plant therein. Each category of the company's property contributes to its total gross receipts. As in rate making, it is reasonable to assume that there is a relationship between the value of the property and the amount that it earns. Moreover, no other method of apportionment is feasible, since invested value is the only common factor between the distributing system and the other operative property that fairly reflects the relative contribution of each category of property to the company's earnings." (*Cf. County of Los Angeles* v. *Southern Counties Gas Co. of California*, 42 Cal.2d 129 [266 P.2d 27].)

The provision embodied in section 27 with respect to attorneys' fees is one whereby Edison agrees to pay to Vernon reasonable attorneys' fees to be fixed by the court in the event any judgment is entered in favor of Vernon in "any suit or proceedings" brought to enforce or interpret any of the terms and conditions of the agreement. The present judgment was rendered in an action which falls within the meaning of section 27; the judgment is in favor of Vernon even though the principal relief it sought is granted upon the condition that it pay a substantial sum of money to Edison. (*Cf. Exchange Nat. Bank* v. *Ransom*, 52 Cal.App.2d 544, 546 [126 P.2d 620].) The award of attorneys' fees was, accordingly, proper. (See *Tibbets* v. *Robb*, 158 Cal. App.2d 330, 342 [322 P.2d 585]; *Gregers* v. *Peterson Ice Cream Co., Inc.*, 158 Cal.App.2d 746, 755 [323 P.2d 572].) No contention is made that the amount awarded is unreasonable.

The judgment is affirmed. Each party shall bear its own costs on this appeal.

Vallée, J., concurred.

Shinn, P. J., did not participate.

A petition for a rehearing was denied May 15, 1961, and the petition of plaintiff and appellant for a hearing by the Supreme Court was denied June 4, 1961.