[Civ. No. 11108.   Third Dist.   Sept. 7, 1966.]

CITIZENS SUBURBAN COMPANY, Plaintiff and Respondent, v. ROSEMONT DEVELOPMENT CO., INC., et al., Defendants and Appellants; SACRAMENTO COUNTY WATER AGENCY, Intervener and Respondent.

668

Morris M. Grupp for Defendants and Appellants.

Orrick, Dahlquist, Herrington & Sutcliffe, Christopher M. Jenks and Richard J. Lucas for Plaintiff and Respondent.

John B. Heinrich, County Counsel, for Intervener and Respondent.

FRIEDMAN, J.—Plaintiff, a water company, seeks specific performance of a service agreement under which it claims the exclusive right to furnish water to the successive "units" of a subdivision development. The subdividers appeal from an adverse judgment.

The Rosemont subdivision is situated in the unincorporated area of Sacramento County just south of Highway 50. Owner of the land was Wunderlich Development Company. Two individuals, A. J. Stern and Richard Price, undertook to develop a residential subdivision in the area. The entire Rosemont tract consisted of approximately 400 acres and the subdividers intended to develop it, unit by unit, to accommodate some 1,600 dwellings, plus a shopping center and apartment house area. Stern and Price operated through a number of partnerships and corporations. In October 1954 one of their firms, United Land Developers, bought from the Wunderlich concern a portion of the tract consisting of 52 acres, later to be known as Rosemont Unit No. 1. When Unit 1 was ready for construction, Stern and Price undertook its development through a limited partnership called Rosemont Development Co. Two corporations were general partners in the firm, while nine corporations and two individuals were limited partners. Wunderlich and the Rosemont limited partnership entered into transactions resulting in subordination of Wunderlich's purchase money lien to construction loans of $500,000, which would permit the limited partnership to put up approximately 50 houses.

Another firm organized by Stern and Price was Rosemont Water Company. That firm had a county franchise to serve water in the area. It installed a water system to serve Rosemont Unit 1. Rosemont Water Company was denied a certificate of public convenience and necessity by the Public Utilities Commission. The subdividers then entered into negotiations with plaintiff Citizens Suburban Company. In the negotiations, Citizens Suburban was represented by its general manager, Thomas Underwood, and the subdividers were represented by Richard Price. On May 23, 1956, Citizens Suburban entered into a water service agreement with the Rosemont limited partnership to furnish water services within the subdivision. The territorial coverage of the water service agreement is in dispute and will be discussed at a later point. The water service facilities of the Rosemont Water Company serving Unit 1 were to be sold to Citizens Suburban at a specified price. Water service was to be extended to future units as

requested by the subdivider. The agreement was to bind the parties' "successors and assigns." The obligations of Citizens Suburban were contingent upon its receiving a certificate of public convenience and necessity from the Public Utilities Commission. A "closing date" for the sale of the existing water service facilities was to occur within 15 days after issuance of the Public Utilities Commission certificate. Price signed the agreement in his capacity as president of Sunnyvale Home Builders, Inc., one of the general partners of the limited partnership. As vice president of Rosemont Water Company, he signed a clause manifesting that firm's consent to the agreement.

Some weeks preceding execution of the May 23 water service agreement, controversies had developed between Stern and Price. The controversies were to culminate in the severance of their association. Although severance arrangements were under discussion at the time the May water service agreement was signed, Price did not disclose this aspect of the subdividers' affairs to Citizens Suburban. Dissolution of the association between Stern and Price was formally recognized on September 11, 1956, when Price executed documents resigning as an officer and relinquishing his interest in the subdividers' various corporations and partnerships. Wunderlich Development Company (headed by Martin Wunderlich) then took over the Stern-Price interests in the Rosemont tract development and assumed liability on the $500,000 bank construction loan. Martin Wunderlich asked Richard Price if he would manage the Rosemont subdivision for Wunderlich as a salaried employee. Price accepted the offer and on September 12 or 13 became Wunderlich's subdivision manager.

Knowing nothing of the limited partnership's imminent withdrawal as developer of the subdivision, Citizens Suburban in June 1956 applied to the Public Utilities Commission for a certificate of public convenience and necessity. In July Price appeared as Citizens Suburban's witness before the Public Utilities Commission but gave no indication that the Rosemont limited partnership was withdrawing from the development. Price's testimony before the Public Utilities Commission described himself as the subdivider. The certificate of public necessity and convenience having been granted, Citizens Suburban deposited somewhat over $50,000 to pay for the existing water facilities. A grant deed by which the limited partnership conveyed a well site and water service facilities to Citizens Suburban was executed on December 18, 1956, the "clos-

ing date.'' Again, Price signed in his capacity as president of Sunnyvale Home Builders, Inc., one of the general partners in the limited partnership. Actually, he was no longer connected with either of these firms. Although the evidence is in conflict, the trial court found that at the time of the closing arrangements Price led Citizens Suburban to believe that he was still representing Rosemont Development Co., the limited partnership.

At about the time of the closing agreement with Citizens Suburban or shortly thereafter, Wunderlich turned over development of the Rosemont Tract to a partnership consisting of Price and Gordon Reynolds, Wunderlich's son-in-law. Price and Reynolds continued to develop Unit 1 and in 1958 commenced development of Unit 2. Units 3 and 4 followed. For each of these successive units, Price would request that Citizens Suburban send a ''willingness letter,'' which he would forward to the State Division of Real Estate and the Federal Housing Authority as demonstrating that a certificated public utility was willing to supply water to the particular unit. Service extension agreements were executed for each successive unit. These agreements were executed by Price on behalf of the firm of Price & Reynolds. Citizens Suburban thus knew in 1958 that it was no longer dealing with the Rosemont limited partnership. Price, however, was the person with whom the utility did business and the utility's representatives simply assumed that they were dealing with a successor entity in a continuing enterprise.

In March 1959, at Price's request, Citizens Suburban furnished ''willingness letters'' for Units 5 and 6. In August 1959 Price and Theodore Chenault, new general manager for the utility company, had a falling out. Through attorneys, Price commenced arrangements to have Units 5 and 6 served by the Sacramento County Water Agency, a public entity. An election was held in which 102 voters within Unit 5 unanimously voted for the issuance of revenue bonds to finance the installation of water service facilities. Citizens Suburban submitted to Price a proposed line extension agreement for Unit 5. Chenault saw that a well was being drilled in the neighborhood of Units 5 and 6. He wrote Price inquiring as to the purpose of the well. Later Chenault learned that the well was intended to serve Unit 5. Price caused valves to be installed in Citizens Suburban's water lines, shutting off the water flow into Units 5 and 6 from the established portion of the utility's distribution system.

At about the time the controversy with Citizens Suburban broke out, the partnership of Price & Reynolds became incorporated as Rosemont Development Co., Inc., with each of the former partners owning 50 percent of the stock. During 1960 Reynolds sold his stock in the corporation to Martin Wunderlich, his father-in-law.

In July 1960 the utility company filed the present suit, the principal defendants being Rosemont Development Co., Inc., a corporation, Price & Reynolds, a partnership, and Richard Price, both individually and as a partner of Price & Reynolds. Later the Sacramento County Water Agency was granted leave to intervene. Following the trial, the court entered findings of fact. The court found that from the inception of the water service agreement until about October 10, 1959, plaintiff and the defendants Price, Price & Reynolds, and Rosemont Development Co., Inc., dealt with each other with the understanding that all were bound by the terms of the water service agreement; that in October 1959 these defendants commenced interfering with the system with which plaintiff intended to serve Units 5 and 6; that Units 5 and 6 are within the Rosemont tract as contemplated by the water service agreement; that Price had failed to advise plaintiff of the impending dissolution of the Stern and Price enterprises prior to the execution of the water service agreement of May 23, 1956; that during the pendency of the utility company's application for a certificate from the Public Utilities Commission, Price withheld from plaintiff information relative to the impending dissolution of the Stern and Price enterprises; that at the December 18, 1956, closing of the water service agreement Price led plaintiff to believe that he was still representing the limited partnership, Rosemont Development Co.; that Citizens Suburban would not have entered into the water service agreement unless it had understood that it was contracting for the right to serve the entire Rosemont tract with a subdivider who would subdivide the entire tract; that Price's failure to inform Citizens Suburban led the latter to move ahead with its Public Utilities Commission application; that Price withheld the facts from plaintiff to avoid any delay in the commencement of water service to the Rosemont tract; that Price intentionally led plaintiff to believe that the Price & Reynolds partnership was the successor or assign of the original developers; that plaintiff did not know of any significant changes among the subdividers' interests, believing that Price & Reynolds and subsequently Rosemont Development Co., Inc., were the successors of the original developers; that Price,

during the period of dissolution of the Stern and Price enterprises, intended to continue development of the Rosemont tract, either alone or with others. As a conclusion of law, the court held that the defendants were estopped to deny that they were the successors of Rosemont Development Co., the limited partnership; that these defendants accepted the benefits of the May 23, 1956, water service agreement and were bound by its burdens.

The judgment decrees specific performance of the water service agreement of May 23, 1956, including a provision entitling plaintiff to indemnity against defendants for $28,895.98 for fees and expenses of plaintiff's attorneys incurred in connection with this lawsuit; declares the nullity of the water contracts between Rosemont Development Co., Inc., and Sacramento County Water Agency, intervener; directs the transfer of all new water service facilities in accordance with the service extension provisions of the 1956 agreement and requires Sacramento County Water Agency to turn over to plaintiff service revenue in its hands. The Sacramento County Water Agency joins in defendants' appeal.

The central issue is whether the present developers of the Rosemont subdivision are bound by the 1956 water service agreement executed by Rosemont Development Co., the limited partnership. In view of the contract clause binding the original parties' ''successors and assigns,'' an affirmative answer would result if (a) defendants are the successors of the limited partnership as a matter of law, or (b) they are estopped to deny their status as successors. The trial court took the latter approach.

In our opinion the present defendants are bound as successors of the limited partnership without regard to estoppel.[1] At common law an assignment transfers the benefits of an executory contract but not its burdens, unless the assignee expressly assumes the latter. (*Lisenby* v. *Newton,* 120 Cal. 571 [52 P. 813, 65 Am.St.Rep. 203]; *Griffin* v. *Williamson,* 137 Cal.App.2d 308, 315 [290 P.2d 361].) A clause binding ''successors and assigns'' is designed to eliminate the necessity for an express assumption of burdens. (*Weidner* v. *Zieg-*

---

[1] Among the defendants, Rosemont Development Co., Inc., is the present developer of the Rosemont subdivision, while the other defendants, Price & Reynolds (partnership) and Price individually, are not. Nevertheless, defendants make no apparent point of their separate status *vis à vis* that portion of the judgment imposing money liability. Thus we refer to ''the present defendants'' without regard to possible distinctions among them.

*lar,* 218 Cal. 345, 350 [23 P.2d 515], quoting from *Brady* v. *Fowler,* 45 Cal.App. 592, 595 [188 P. 320].) ▇ The notion of succession appears to be wider than the technical confines of contract assignment. According to dictionary and judicial definitions a successor is one who takes the place of another and sustains his part or character. (*Wawak Co.* v. *Kaiser,* 90 F.2d 694, 697; *Appeal of MacKenzie Auto Equipment Co., Inc.,* 71 Idaho 362 [232 P.2d 130, 133]; *State* v. *Andrews,* 64 Kan. 474 [67 P. 870, 877].) In the context of a contract situation, the notion of succession bears strong parallels to the declaration of Civil Code section 1589: "A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations rising from it, so far as the facts are known, or ought to be known, to the person accepting."[2] ▇ Indeed, the statutory declaration provides a useful device for gauging the outer limits of the "successors and assigns" clause of the present contract. ▇ When Wunderlich Development Company took over the Rosemont development from the Stern and Price enterprises, Price's negotiations were concurrently producing a water supplier, Citizens Suburban, whose presence and function would contribute to the future success of the subdivision operations.[3] Direct subdivision operation by Wunderlich was brief, however, for Wunderlich soon turned over the subdivision work to the Price & Reynolds partnership. During the years in which they operated the Rosemont development, that partnership completed Unit 1 and successively developed Units 2, 3 and 4, calling upon Citizens Suburban to extend water service into each of the latter areas. The availability of a water supply at the hands of a certificated

---

[2]Defendants rely on a number of cases for the proposition that Civil Code section 1589 applies only where the party accepting the benefit was a party to the original transaction, citing *Canale* v. *Copello,* 137 Cal. 22, 25 [69 P. 698]; *Stone* v. *Owens,* 105 Cal. 292, 296 [38 P. 726]; *Tarpey* v. *Curran,* 67 Cal.App. 575, 587 [228 P. 62]; *Beazley* v. *Embree,* 41 Cal. App. 706 [183 P. 298]. See also *Fruitvale Canning Co.* v. *Cotton,* 115 Cal.App.2d 622, 626 [252 P.2d 953]. Later decisions such as *Weidner* v. *Zieglar, supra,* 218 Cal. 345, and *Gregers* v. *Peterson Ice Cream Co.,* 158 Cal.App.2d 746 [323 P.2d 572], apply the statute to secondary parties. The latter impel us to reject the proposition, to regard its supporting cases as obsolete and to view with scepticism the statement of the proposition in 5 California Jurisprudence 2d at page 347.

[3]In view of the "voluntary acceptance" doctrine, a showing of a documentary chain of contract assignments seems unnecessary. It is interesting to note that when Wunderlich took over from the Stern-Price associates, Wunderlich assumed "all unpaid bills or obligations . . . arising from construction of the 50 houses and/or the purchase and development of the land involved." What documents passed from Wunderlich to the later operators of the subdivision does not appear.

public utility enabled the partnership to finance house construction, to secure takeout commitments for permanent financing, to secure subdivision reports demonstrating water availability (see Bus. & Prof. Code, § 11000 et seq.) and to sell homes to customers. When Price & Reynolds formed Rosemont Development Co., Inc., in 1959, the corporation became the beneficiary of the assets, financial position and marketing opportunities of the partnership, all of which owed much to the availability of water service supplied by plaintiff. The partnership and later the corporation voluntarily accepted the benefits of the water service agreement so long as they found it profitable and convenient to do so. ▮ When a corporation knowingly accepts the benefits of a contract entered into by its promoters before it comes into existence, it is liable as a party to the contract. (*White* v. *Kaiser-Frazer Corp.*, 100 Cal.App. 2d 754, 760 [224 P.2d 833].) That the acceptance was knowing is demonstrated by Richard Price's continued presence as a principal actor in both these entities. ▮ Having knowingly accepted the benefits of the contract, the present developers must be held to its burdens and are, as a matter of law, the "successors" of the original contracting party.

Defendants argue that the territorial scope of the contract is limited to Unit 1, which is all that Stern and Price controlled in 1956. They point out also that Stern and Price hoped but had no right to acquire and subdivide additional units of land. ▮ The contract itself refers to a "subdivision" consisting of the entire Rosemont tract.[4] It provides for sale to the utility of the water system for Unit 1 and for the extension of service facilities "whenever construction of further homes in the Subdivision requires extension of the Existing Facilities . . . ." It contains a warranty that the subdivider "possesses and is vested with full and complete right and authority to develop the Subdivision . . . ." Plaintiff cor-

---

[4]Among the contract recitals are the following:

"Whereas, the Subdivider is engaged in developing a real estate tract known as Rosemont in the County of Sacramento, State of California, herein called the Subdivision;

". . . . . . . . . . . . . .

"Whereas, the Subdivider has constructed and installed a water system to serve Unit No. 1 of the Subdivision, *and desires and requests* the *Utility to furnish water service to the Subdivision,* and to that end is willing to sell and caused to be sold to the Utility, the aforesaid franchise and water system; and

"Whereas, the Utility is willing to furnish water service within the Subdivision, to purchase said franchise and water system, and to construct and install all extensions of said water system required to serve the Subdivision . . . ." (Italics supplied.)

rectly asserts that the agreement amounts to a "requirements" contract. Although it did not in so many words give the water company the exclusive right to supply water within the Rosemont tract, it effectually bound the subdivider to look to the utility for all water service. The latter in turn was bound by its contract to extend its service into additional units whenever the extension provisions went into operation.

From the standpoint of territorial coverage the contract was fairly ambiguous. It referred to no quantum of acreage and annexed no map or real estate description. The trial court found (finding No. 9) that in referring to the subdivision the contracting parties intended to refer to the entire present and proposed development of the Rosemont tract, consisting of 400 acres and 1,600 homes, including what are now Units 5 and 6. Although heavily attacked on appeal, the finding is supported by ample evidence of the parties' contemporaneous intent, including a map utilized in the water company's 1956 application to the Public Utilities Commission and Price's own testimony at commission hearings. ■ When interpretation of an ambiguous contract turns on conflicting evidence of the parties' intent, an appellate court will accept the finding of intent made by the trial court and the contract interpretation stemming from it. (*Parsons* v. *Bristol Dev. Co.,* 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839]; *Estate of Platt,* 21 Cal.2d 343, 353 [131 P.2d 825].)

■ The water company's expectations of patronage expansion beyond Unit 1 depended not on the subdivider's binding promises but on the latter's profit motive. Each expansion into a new subdivision unit would produce a new group of water consumers. It is elementary that a contract in which one party agrees to supply and the other agrees to take all its requirements is mutually enforceable. (*Marin Water etc. Co.* v. *Town of Sausalito,* 168 Cal. 587, 599, 600 [143 P. 767]; *El Rio Oils Ltd.* v. *Pacific Coast Asphalt Co.,* 95 Cal. App.2d 186, 193 [213 P.2d 1].) That the limited partnership was not bound to buy more units of land and build more houses caused no lack of contract mutuality. The 1956 limited partnership and its "successors" were required by their contract to seek water service from plaintiff for all future real estate development within the Rosemont tract.

■ In contrast to their argument that the water company lacked a contract right to furnish water throughout the entire tract, defendants indulge in a curious inversion, contending that the water company's public utility status required it to

serve all members of the public within the dedicated area, including defendants, who thus accepted no benefits beyond those accorded to them as members of the public. The argument lacks merit. Even though the system and supply of a water company have been dedicated to a public use, the law will recognize and enforce its independent contract, except as the latter may be modified by public utility regulation. (*Coulter* v. *Sausalito Bay Water Co.*, 122 Cal.App. 480, 493 [10 P.2d 780]; see *Southern Pac. Co.* v. *Spring Valley Water Co.*, 173 Cal. 291, 297, 298 [159 P. 865, L.R.A. 1917E 680].) The developer of the Rosemont subdivision did not enter into the contract as a water customer, but as an entrepreneur who expected to profit from the sale of houses which had water availability. The benefits flowing to the subdividers from the contract were entirely distinct from those furnished to the water-consuming public. (See *Sawyer* v. *City of San Diego*, 138 Cal.App.2d 652, 658-660 [292 P.2d 233].) Contract benefits in the form of profit opportunities were voluntarily accepted by the successive subdividers.

In the alternative the judgment is sustainable on the theory adopted by the trial court—an estoppel barring the present defendants from denying their status as "successors" to the original contracting party.

█ Properly invoked, an estoppel will preclude a party from denying a fact where his own action has led another so to conduct himself that the latter would suffer harm if the truth were recognized. (*Davenport* v. *Stratton*, 24 Cal.2d 232, 243 [149 P.2d 4]; *Martin* v. *Superior Court*, 199 Cal.App.2d 730, 735 [18 Cal.Rptr. 773].) █ Its essential elements are: (1) that the party to be estopped must be apprised of the facts; (2) he must intend that his conduct will be acted upon, or act in such a manner that the other party could reasonably believe that he intended his conduct to be acted upon; (3) the other party must be ignorant of the true facts, and (4) he must rely upon the conduct to his injury. (Code Civ. Proc., § 1962, subd. 3; *Crestline Mobile Homes Mfg. Co.* v. *Pacific Finance Corp.*, 54 Cal.2d 773, 778 [8 Cal.Rptr. 448, 356 P.2d 192]; 18 Cal.Jur.2d, Estoppel, § 5, pp. 406-407; see Civ. Code, § 1623.) █ The concept of injury is equated with any prejudicial change of position. (*Parsons* v. *Bristol Dev. Co.*, *supra*, 62 Cal.2d at p. 869.) It is enough that a party may have been induced to refrain from taking steps to retrieve his position and to avoid loss. (*Benner* v. *Industrial Acc. Com.*, 26 Cal.2d 346, 349-350 [159 P.2d 24].)

During the weeks he was negotiating the May 1956 agreement with plaintiff, Price was simultaneously engaged in negotiations which, in September, would culminate in the dissolution of his association with Stern and in the withdrawal of Rosemont Development Co. (the limited partnership) as developer of the Rosemont tract. Price gave Citizens Suburban's representatives no inkling of the imminent or actual withdrawal of the business entity with which it was contracting. He maintained secrecy while the water company signed the May agreement with a firm which was about to fold its tents and silently steal away; while the water company achieved public utility status and committed itself to future service and expansion of its facilities in the area (Pub. Util. Code, § 762; see *Lukrawka* v. *Spring Valley Water Co.*, 169 Cal. 318, 324-332 [146 P. 640, Ann.Cas. 1916D 277]; cf. *California Water & Tel. Co.* v. *Public Utilities Com.*, 51 Cal.2d 478, 490-495 [334 P.2d 887]); while the water company paid over $50,000 for the existing water facilities; while the water company closed the agreement in December 1956 with the counterfeit presence of a firm which had left for parts unknown. The water company, in all common sense, was relying on the subdivider to build houses and to provide water customers. The subdivider with which it contracted had no motive to do so. Good conscience required Price to disclose the facts. An estoppel arises from silence where there is a duty to disclose, where the party has an opportunity to disclose and knowing that the circumstances require him to disclose, remains silent. (*People* v. *Ocean Shore R.R., Inc.*, 32 Cal.2d 406, 421-422 [196 P.2d 570, 6 A.L.R.2d 1179]; 18 Cal.Jur.2d, Estoppel, § 8, pp. 408, 409.) The trial court findings, which are fully supported by the evidence, set forth all the elements of an estoppel to prevent Price (and those in privity with him) from denying that they are "successors" of the limited partnership which executed the water service agreement of 1956.

An estoppel binds not only the guilty party but those in privity with him; while privity generally involves persons so identified in interest that they represent the same legal right, the discernment of privity rests upon a case-by-case examination. (*Lerner* v. *Los Angeles City Board of Education*, 59 Cal.2d 382, 397 [29 Cal.Rptr. 657, 380 P.2d 97].) Thus estoppel by privity is not a static notion, but adaptable to the practical demands of the situation. Formal assignments and assumptions of responsibility are the usual links in

a chain of privity but not necessarily so. Residential subdivision development in California is characterized by a proliferation of organizational forms and quick shifts of name, ownership and control. (See California Land Security and Development (Cont. Ed. Bar, 1960) pp. 538-560.) In this case a continuous subdivision development, designated by a single name and defined in territorial scope, is continued over a period of years by a succession of business entities and shifting ownerships. One entity in this succession contracts with a utility supplier, which then assumes a fixed commitment under public utility law to serve all customers within the designated area. The contracting subdivider is succeeded by other developers who accept the utility's presence and availability as beneficial ingredients of continued subdivision development.

A fitting criterion of privity is supplied by a concept appearing elsewhere in this case. The concept is that expressed in Civil Code section 1589, *supra.* Applied to the facts, it would be expressed as follows: Voluntary and knowing acceptance of contract benefits among the successive subdividers created a chain of privity without regard to express assignments or formal assumptions of contract burdens. At the time of the December 1956 water service agreement the ostensible contracting party (Rosemont Development Co., the limited partnership) had already left the scene. Immediate beneficiary of Price's nondisclosure was Wunderlich, the new operator of the Rosemont development. The evidence is not clear whether Wunderlich was the active developer in December 1956 or whether he had already turned the operation over to Price and to his son-in-law, Reynolds. Either before December or within a few months thereafter, the Price & Reynolds partnership became the active developer. For several years following, the partnership used the water service agreement as an important instrumentality in the continued expansion of the Rosemont development. When the two partners incorporated, the corporation continued to receive the benefits of the Citizens Suburban water supply in the developed units of the subdivision. Price, a pervading figure in all these entrepreneurships, was perfectly aware of the methods he had used to lure Citizens Suburban into its commitments. Knowing acceptance of the contract benefits by each of the successive developers creates privity which estops the present developers from asserting that they are not "successors" of the original contracting party.

Defendants make a wide-ranging attack on numerous find-

ings of fact forming the basis for the trial court's invocation of estoppel. ▮▮▮▮ On appeal, we view the evidence in the light most favorable to the findings of the trial court, will not weigh the evidence, will indulge all reasonable inferences which favor the findings and do not disturb findings supported by substantial evidence. (*Berniker* v. *Berniker,* 30 Cal.2d 439, 444 [182 P.2d 557].) We shall not engage in a detailed analysis of the findings and of their evidentiary support. Suffice it to say that all findings of fact (with one exception mentioned *infra*) are supported by substantial evidence; that several findings claimed to be conclusions of law are, in our opinion, declarations of ultimate fact; that other findings urged to be irrelevant are relevant. Several findings do call for comment. Finding No. 24 is a declaration that not until 1960 did plaintiff learn of Price's 1956 withdrawal from the Stern and Price enterprises. Actually, counsel for plaintiff had stipulated that his client knew in June 1958 that Price and Reynolds had become the subdividers. Nevertheless, in finding No. 25 (which has ample evidentiary support) the court finds that Price intentionally led plaintiff to believe that the Price and Reynolds partnership was the successor or assign of the 1956 limited partnership. Thus the error in finding No. 24 has no significance.

Finding No. 32 declares that at the time of the water service agreement of May 23, 1956, virtually all land in the Rosemont tract was owned by United Land Developers, a Stern and Price enterprise. Defendants are correct in asserting lack of evidentiary support for this finding. The evidence is that in 1956 the Stern and Price group had title only to Unit 1.[5] The remainder of the Rosemont tract was controlled by Wunderlich Development Company awaiting future development, unit by unit. As we have already noted, the estoppel is not predicated on misrepresentations as to the quantity of land under the subdividers' control. The finding in question is unnecessary and the error not prejudicial.

Defendants complain that the decree orders conveyance of well sites and water rights serving Units 5 and 6 without any provision for paying defendants. To the contrary, the decree orders conveyance "under the terms and conditions" of the May 1956 water service agreement. The agreement contains provisions by which the company will pay for real property interests conveyed to it by the subdividers. Should the present

[5]Nevertheless, in the water service agreement of 1956 the "Subdivider" represents that "it possesses and is vested with full and complete right and authority to develop the Subdivision . . . ."

parties be unable to agree on price, the court may determine the dispute under its continuing equity powers.

Defendants seek appellate nullification of the award of attorney fees and expenses incurred in the lawsuit, claiming lack of authority for such an award. The award is premised on an indemnity clause in the contract.[6]     Attorney fees cannot be allowed a successful litigant without pleading and proof that there is a contract provision for them. (*Genis* v. *Krasne*, 47 Cal.2d 241, 246 [302 P.2d 289].)     Most such awards rest upon contract language expressly providing for attorney fees in the event of suit to enforce the contract. The contract may impliedly as well as expressly permit their recovery. (*Arthur B. Siri, Inc.* v. *Bridges*, 189 Cal.App.2d 599, 603 [11 Cal.Rptr. 322].)     While the word ''costs'' does not usually embrace counsel fees, the phrase ''costs and expenses'' does. (*Mitsuuchi* v. *Security-First Nat. Bank,* 103 Cal.App.2d 214, 218 [229 P.2d 376]; 26 Cal.Jur.2d, Indemnity, § 26, pp. 363-365; see 13 Cal.Jur.2d, Costs, § 36, p. 259.)     A standard attorney fee clause is really a contract of indemnity. (42 C.J.S., Indemnity, § 5, p. 570.) Indemnity for litigation expenses may be sought not only where the indemnitee defended a lawsuit brought by a third party but also where he was plaintiff. (See, e.g., *Mitau* v. *Roddan*, 149 Cal. 1, 15-17 [84 P. 145, 6 L.R.A. N.S. 275]; 42 C.J.S., Indemnity, § 13, p. 586, note 46.)

The parties here contracted for indemnification for the utility's ''costs or expenses . . . by reason of the Subdivider's . . . non-compliance . . . .'' The quoted phrase calls for payment of enforcement expenses occasioned by noncompliance. While broader than the standard attorney fee clause, there is no reason why it should not include the same kind of enforcement expense, provided that the enforcement action is brought in good faith and is reasonably necessary. Plaintiff's success in the trial court and in this court is sufficient assurance of the latter factors. Defendants do not claim unreasonableness in the amount awarded.

At oral argument counsel for defendants adverted to the uniqueness of a sizeable attorney fee award against parties who were not signatories and had never expressly assumed the agreement under which the award was made.     Defend-

[6]The indemnity clause reads as follows: ''The Subdivider shall indemnify and hold the Utility harmless from any and all claims, demands, liabilities, losses, costs or expenses which it may suffer, incur or be put to by reason of the Subdivider's default under or non-compliance with the aforesaid covenants, representations and warranties.''

ants knowingly accepted the agreement's contribution to their subdivision development and were bound by all its burdens, not part. As we have held, no formal assumption of contract burdens was necessary. The evidence and findings depict a series of deliberate choices by defendants to exclude the water company from serving consumers outside Units 1 through 4, to replace plaintiff by another supplier and to litigate the controversy at length. They had a full view of the entire agreement, including the indemnity clause, as they took these choices.

Defendants raise procedural objections to the award. Although the complaint did not in terms pray for litigation expenses, it sought specific performance of the entire water service agreement and incorporated the agreement (including the indemnity provision) by reference. The agreement was placed in evidence. Under these circumstances there was adequate pleading and proof of the contract provision under which the award was made. (*Genis* v. *Krasne, supra.*)

The issue of attorney fees and expenses was not included in the joint pretrial conference statement or the pretrial order. (There is no assertion of a deliberate omission.) After the principal issues in the case were tried and a decision in plaintiff's favor announced, entitlement to costs and expenses, including attorney fees, was declared in the trial court's conclusions of law. Thereafter a hearing was held upon adequate notice and evidence relative to the award was taken.

At this point a certain discord arises between the demands of pretrial procedure and traditional equity doctrine. The pretrial order fixes the issues and controls the subsequent course of the case unless later modified. (Cal. Rules of Court, rule 216.) An equity court, on the other hand, will do complete justice between the parties, whether or not the particular relief was requested. (*Sears* v. *Rule,* 27 Cal.2d 131, 149 [163 P.2d 443]; *Sonnicksen* v. *Sonnicksen,* 45 Cal.App.2d 46, 52 [113 P.2d 495].) In this case the discord is not acute. When an issue has been actually litigated upon adequate notice, the losing party may not object on appeal to the issue's noninclusion in the pretrial order. (*Collison* v. *Thomas,* 55 Cal.2d 490, 498 [11 Cal.Rptr. 555, 360 P.2d 51]; Witkin, Cal. Procedure (1965 Supp.) pp. 627-628.) There was no error in the award.

Judgment affirmed.

Pierce, P. J., and Regan, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied November 2, 1966.