[Civ. No. 13051. Third Dist. May 11, 1972.]

THE PEOPLE EX REL. DEPARTMENT OF PUBLIC WORKS, Plaintiff and Appellant, v.
RUDOLPH H. VOLZ et al., Defendants and Respondents.

COUNSEL

Harry S. Fenton, John B. Matheny, Edward J. Connor, Jr., George L. Cory and Elias D. Bardis for Plaintiff and Appellant.

Lally, Martin, Chidlaw & Brown, William Chidlaw, James P. Jackson and David McMurtry, City Attorneys, and John B. Heinrich, County Counsel, for Defendants and Respondents.

OPINION

**FRIEDMAN, Acting P. J.**—The state appeals from a judgment condemning a parcel for state highway purposes and awarding $150,000 in damages. The only issue on appeal is whether the trial court correctly excluded the state's proposed evidence of a street easement traversing the property. The case was fairly tried and no prejudicial error occurred. The judgment will be affirmed.

The parcel in question comprises about six and one-half acres. It occupies an area approximately 900 feet long and 360 feet wide between the westerly edge of Riverside Boulevard and the easterly edge of the Sacramento River in the City of Sacramento. Defendants Rudolph and Anna Volz are the owners. The State Reclamation Board owns an easement for levee purposes covering most or all the parcel. A levee traverses the length of the parcel, occupying its westerly or riverward portion. In the eastern portion of the parcel Riverside Boulevard, a public street, runs parallel to the levee.[1] The street right-of-way is 60 feet wide. Except for a curve swinging easterly in the northward portion of the parcel, Riverside Boulevard runs approximately parallel to the levee.

The easterly or landward side of the levee does not slope downward to a toe. Instead, land fill approximately 18 feet deep has been placed alongside the levee. Riverside Boulevard is located on top of the easterly edge of the land fill. The filled-in space between the levee crown and Riverside Boulevard is approximately 90 feet wide along most of the

---

[1] In 1910 and 1940 transactions occurred between the predecessors of Volz and the County of Sacramento involving the Riverside Boulevard right-of-way. These transactions will be described at a later point. At that time the property was outside the Sacramento city limits, and the affected portion of Riverside Boulevard was a county road.

length of the parcel.[2] Prime issue at the valuation trial was whether the space between the levee crown and the setback along the west edge of Riverside Boulevard was a feasible site for construction of a three-story apartment house project. The landowners' two appraisal witnesses testified that the apartment development was feasible and represented the parcel's highest and best use. Inferably, the jury agreed with their testimony because it brought in a verdict of $150,000, the higher of the two valuations fixed by the landowners' appraisers.[3]

Because feasibility of defendants' apartment house project in the area between the levee and Riverside Boulevard was to be a prime issue at the valuation trial, activities preceding the jury trial included considerable jockeying over the precise location of the boulevard's right of way. The street had been constructed at its present location in 1940. Attached to the state's complaint was a map showing one version of the street right of way. Later the parties filed pretrial statements. In these statements neither gave express recognition to the street location problem. A pretrial conference was held on July 23, 1969, and an order made directing each party to furnish the other copies of any map it intended to use at the trial.

On December 5, 1969, the trial opened without a jury for the purpose of establishing comparable sales and resolving other nonjury issues. Maps were exchanged. The state placed in evidence a 1940 deed from private landowners to the County of Sacramento covering the Riverside Boulevard right of way. From this deed and from a newly discovered monument the state had now plotted a map (offered in evidence) which showed an alignment of the Riverside Boulevard right of way differing by a foot or two from that shown on the map attached to the state's complaint and used by the landowners' appraisers. A hearing was held and the state's "new" location upheld. The court directed that the landowner be given time to prepare for jury trial on the basis of the new map.

Ultimately the trial reopened with a jury on June 1, 1970. Again, outside the jury's presence, a controversy broke out over maps depicting the "buildable" area between the levee crown and the setback line along the west edge of Riverside Boulevard. This controversy was settled by a

---

[2] This statement represents only an approximation. In responding to an interrogatory, plaintiff declared that at the south end of the parcel the distance from the westerly edge of Riverside Boulevard to the crown of the levee was 93 feet "based upon present preliminary information." ·

[3] The state's two appraisal witnesses supplied valuations of $15,000 and $21,000, respectively.

compromise stipulation to which counsel on both sides agreed. The jury trial then commenced and the condemnees presented their case in chief.

The landowners rested and the state opened its rebuttal. As its first witness the state called Raymond Jacobs, a Division of Highways engineer. Through Mr. Jacobs the state—for the first time in the lawsuit—came up with the contention that, by virtue of two 1910 deeds, the County of Sacramento owned a right of way for Riverside Boulevard located approximately 60 feet west of that conveyed by the 1940 deed. Such a right of way would sit astride the "buildable" rectangle available to the landowners between Riverside Boulevard and the levee. If established, a county-owned right of way so located would demolish all possibility of the apartment house development described by the landowners' appraisal witnesses.

To accomplish its objective, the state offered in evidence certified copies of two 1910 deeds and a plastic overlay map plotted from these deeds. The overlay map depicted two parallel rights of way for Riverside Boulevard—one plotted from the 1940 deed; the other, 60 feet to the west, plotted from the 1910 deeds.[4] Although the state contends otherwise, counsel for Volz made an adequate objection to the offer. On *voir dire* examination of Jacobs, the following facts were brought out: Prior to 1940 Riverside Boulevard had been located along the toe of the levee; in 1940 the Corps of Engineers wished to place land fill along the landward slope and berm of the levee (apparently to strengthen the levee) and, to that end, to relocate Riverside Boulevard in an easterly direction; the property owners (predecessors of defendants Volz) deeded to the County of Sacramento a more easterly right of way for the purpose of permitting the relocation; as a consequence of the project, Riverside Boulevard was relocated and placed on top of the easterly portion of the land fill; the boulevard's former right of way was buried under 18 feet of fill and had been so buried ever since 1940.

The trial court sustained the landowners' objection to evidence of the 1910 right of way. In effect, the court charged the state with deliberately concealing its intention to claim continued existence of the 1910 right of way; with deliberately permitting the landowners to prepare for trial on the assumption that the 1910 street easement had lapsed; with

---

[4]The state had placed the 1940 deed in evidence when the trial opened without a jury in December 1969. It did not offer the 1910 deeds in evidence until June 1970, after the valuation trial opened before the jury and after the landowners had presented their appraisal witnesses.

invoking the 1910 street easement as a surprise weapon to destroy the valuation testimony of the defendants' appraisers. The trial court took the view that the state's conduct in the lawsuit estopped it from invoking the 1910 street easement.

The state had indeed pursued an objectionable tactic. At the opening of the trial in December 1969 counsel for both sides entered the court-room for the purpose of arriving at decisions on all (not selected) nonjury issues. The existence and location of the 1910 right of way was such an issue. Nevertheless, the attorneys for the state chose to relegate the 1910 deeds to temporary oblivion.[5] At that time the trial judge informed counsel that a continuance was necessary to permit the landowners' appraisers to deal with the realignment inferred from the 1940 deed. The trial then recessed for what turned out to be six months. The record does not show how much money defendants spent on appraisal revisions. Inferably, such revisions would require new maps, ascertainment of setback lines from the street and from the levee, architectural consultations and physical and financial studies.

While the landowners were investing in revised appraisals, counsel for the state held the 1910 deeds in readiness for the coming jury trial. Destruction of the landowners' valuation evidence and loss of the defendants' investment in appraisals were the goals of the state's tactic.[6] Landowners faced with condemnation are often in an unenviable position, forced to gamble trial preparation expenses in defense of their own interests. (See *County of Los Angeles* v. *Ortiz,* 6 Cal.3d 141 [98 Cal.Rptr. 454, 490 P.2d 1142].) Inflation of the financial gamble through state-engineered surprise is unconscionable. It offends judicial notions of fair play. To put the matter plainly, the state sought to sandbag the opposition.

The state's briefs offer a series of verbal self-justifications, none of them convincing. Primary support is sought in the general eminent domain rule imposing on the owner the burden of pleading and proving the extent

---

[5]Mr. Jacobs testified that copies of the 1910 deeds had been in the state's possession for several years. There is no claim that counsel for the landowners were ignorant of the 1910 deeds, which had been recorded. The unfolding of the trial indicates full awareness. The landowners' defensive position was imperiled not by ignorance of the 1910 deeds, but by state-induced unawareness that the state was going to use them. The 1910 right of way had been buried under 18 feet of fill for 30 years.

[6]In its reply brief the state describes its tactical objective in the following terms: "After the 1910 easement was properly located by a qualified engineer, then appellant [state] intended to have its appraisers explain the effect this easement had upon the fair market value of the property." At another point the reply brief declares that evidence of the 1910 easement had a "very critical" impact upon valuation.

and nature of his ownership. (Code Civ. Proc., § 1246; *People* ex rel. *Dept. Pub. Wks.* v. *Lundy,* 238 Cal.App.2d 354, 357 [47 Cal.Rptr. 694]; *City of Santa Cruz* v. *Younger,* 223 Cal.App.2d 818, 822 [36 Cal.Rptr. 253].) The landowners, the state contends, were obliged to bring in evidence of the cloud on their own title.

The question is not one of burden of proof at all, but of adherence to fair and orderly procedures. Two procedural sources demanded early disclosure of the state's intentions. One source was adherence to the spirit and purpose of pretrial, that is, " 'to find out what the lawsuit is about.' " (*Universal Underwriters Ins. Co.* v. *Superior Court,* 250 Cal.App.2d 722, 728 [58 Cal.Rptr. 870], quoting from *Pulse* v. *Hill,* 217 Cal.App.2d 301, 304 [31 Cal.Rptr. 765].) The 1967 change to optional pretrial should heighten judicial alertness to prevent its exploitation as a trap. (See Cal. Rules of Court, rules 208, 210.) The state's choice of tactics effectively frustrated the pretrial procedure. Its pretrial statement was highly selective, omitting any mention of the earlier Riverside Boulevard easement. The pretrial conference order called for an exchange of maps; the state withheld one which, according to its own argument, had great financial significance.

The other source of obligation was the court's need for time and space in which to resolve nonjury questions. In eminent domain actions, the only issue for the jury is valuation; all other issues are to be tried by the court. (*People* v. *Ricciardi,* 23 Cal.2d 390, 402 [144 P.2d 799].) Consistently with sound judicial administration, the trial court had set aside a preliminary, nonjury phase of the trial for the resolution of nonjury issues. The state's stratagem effectively prevented the court from hearing and determining the status of the 1910 street easement prior to jury impanelment. By withholding the issue until its rebuttal, the state would have forced suspension of the jury trial pending the trial court's inquiry and ruling. If that ruling were unfavorable to the landowners, fairness might then call for new appraisals and fresh delay. The court would then have a choice of holding the same jury in suspension or of declaring a mistrial and starting the trial anew. Any profit to the state highway fund would be weighed in the balance against the increased cost of court operation. One segment of government would pay for the tactical choices of another.

In any event, the landowners' burden of proving title did not require defendants Volz to inject the 1910 deeds into the lawsuit. These deeds had been recorded. No party claims ignorance of them. ▮ When a condemnation complaint does not concede a defendant's ownership, he

may fulfill his burden of proof by prima facie evidence of fee ownership. (2 Nichols on Eminent Domain (3d ed.) § 5.2[3].) It is then open to the condemner to prove the existence of easements and restrictions which may diminish market value. (*Id.*) The condemnee need not devalue his own title by conjuring up hypothetical or remote clouds.

The briefs debate propriety of the trial court's estoppel theory. Conduct in litigation may cause the courts to invoke "judicial estoppel" to prevent unfairness. (*Coleman* v. *Southern Pacific Co.,* 141 Cal.App.2d 121, 128 [296 P.2d 386]; 31 C.J.S., Estoppel, § 117.) The state points out that ignorance of the true facts is an essential of estoppel; that defendants could not claim ignorance of the recorded 1910 deeds. (See *City of Los Angeles* v. *Babcock,* 102 Cal.App. 571, 576 [283 P. 314].) The trial court did not postulate the landowners' ignorance of the deeds' existence. Basis of the trial court's ruling was the landowners' induced ignorance of the state's intention to invoke them.

Judicial estoppel barring the condemner's evidence of diminished valuation may be too harsh a remedy for procedural misjudgment. It may cause the condemner financial injury outstripping the financial peril to the condemnee. Estoppel is equitable; applied too readily, it is harsh, rife with possibilities of a penalty outweighing the offense; it applies defensively only, never to give an unfair advantage to the party invoking it. (*Franklin* v. *Merida,* 35 Cal. 558, 566-567; *Meyer* v. *Glenmoor Homes, Inc.,* 246 Cal.App.2d 242, 267 [54 Cal.Rptr. 786, 55 Cal. Rptr. 502]; *Peskin* v. *Phinney,* 182 Cal.App.2d 632, 636 [6 Cal.Rptr. 389].) Assuming without holding that an unconditional judicial estoppel was error in this case, other considerations supply an alternative ground for excluding evidence of the 1910 easement. Relevant at this point is the rule that a correct order will be sustained on appeal regardless of the trial court's theory. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 262.)

Estoppel other than that of the judicial variety barred evidence of the 1910 right of way. Elements of estoppel are (1) awareness of the party to be estopped; (2) his intention that his conduct be acted upon; (3) the second party's ignorance of the facts, and (4) the latter's reliance upon the conduct and consequent injury. (*Cal. Cigarette Concessions* v. *City of L. A.,* 53 Cal.2d 865, 869-870 [3 Cal.Rptr. 675, 350 P.2d 715].) Injury is equated with a prejudicial change of position. (*Parsons* v. *Bristol Development Co.,* 62 Cal.2d 861, 869 [44 Cal.Rptr. 767, 402 P.2d 839].) When, as here, the facts are undisputed, existence of an estoppel is a question of law. (*Cal. Cigarette Concessions*

v. *City of L. A., supra,* 53 Cal.2d at p. 868.) ▪ An estoppel binds not only the guilty party but those in privity with him; discernment of privity rests upon a case-by-case examination. (*Citizens Suburban Co.* v. *Rosemont Dev. Co.,* 244 Cal.App.2d 666, 680 [53 Cal.Rptr. 551].)

▪ When a street or road easement has been created by dedication or deed, it does not die through disuse, even when taxes have been levied on the entire tract. (*City of Imperial Beach* v. *Algert,* 200 Cal.App.2d 48, 51 [19 Cal.Rptr. 144].) ▪ In order to guard against street closures favoring private interests, a general rule requires the city or county to resort to statutory abandonment formalities; in exceptional cases, nevertheless, the public may be estopped to claim continued existence of a street or road easement. (*Palo Alto Inv. Co.* v. *County of Placer,* 269 Cal. App.2d 363, 366-368 [74 Cal.Rptr. 831].)

▪ Were Riverside Boulevard still a county road, the events of 1940 would emphatically estop the county from claiming continued existence of the 1910 easement. In order to assist the reclamation authorities' need for strengthening the levee, the county had agreed to the 1940 relocation of Riverside Boulevard. In order to meet the public's need, the Volz' predecessors granted the county a more easterly right of way, 60 feet wide. There is no claim of consideration, no record of an exchange, no inference but that of a gift from the landowners to the public. Inferably, the landowners were guided by more than benevolence, for they would now have a much wider strip of useable land between Riverside Boulevard and the levee. The parties have referred to no record of abandonment of the 1910 right of way. Presumably, then, the county made no reconveyance and took no street closure proceedings. Whether the Volz' predecessors had legal advice in 1940 is unknown. The county had a staff of attorneys and road department personnel. The deed was accepted by the board of supervisors and recorded at the county's request. Had the county been circumspect, it would have pointed to the perils emanating from a continuing record of the 1910 easement, now to be buried under 18 feet of fill. Had it warned the landowners, the latter could have called for a reconveyance and formal abandonment of the 1910 easement. As it was, two parallel recorded street easements ran the length of the parcel, each 60 feet wide, each for the identical street. The landowners now had a wider strip of useable land, but it was burdened with a buried, unused and unuseable street easement. The circumstances present all the elements of an estoppel against the County of Sacramento—its awareness of the landowners' interest in eradication of the 1910 easement; its apparent failure to warn; its intention to receive the fruits of the transaction; the land-

owners' apparent reliance upon the county's conduct and the disadvantage thereby impressed upon their property.

Upon the area's annexation, the City of Sacramento succeeded to the county's street interests. (Sts. & Hy. Code, § 989.) Upon the property's condemnation for a state highway, the state succeeds to the city's street interests. (Sts. & Hy. Code, § 83.) Thus a chain of privity exists which fastens upon the state the county's estoppel to assert continued existence of the right of way conveyed in 1910. The trial court correctly excluded evidence of the 1910 easement, for the easement did not obstruct the landowners' use of the property.

Judgment affirmed.

Regan, J., and Janes, J., concurred.

A petition for a rehearing was denied June 7, 1972.