[Civ. No. 32541. First Dist., Div. Three. Oct. 3, 1974.]

BERKELEY LAWN BOWLING CLUB, Plaintiff and Respondent, v. CITY OF BERKELEY et al., Defendants and Appellants; NEIGHBORHOOD COMMITTEE FOR A PUBLIC PARK et al., Interveners and Appellants.

COUNSEL

Donald P. McCullum, City Attorney, Kathryn L. Walt and Susan Watkins, Assistant City Attorneys, Michael Lawson, Deputy City Attorney, and Charles O. Triebel, Jr., for Defendants and Appellants.

Dawn B. Girard, Carmen L. Massey and Henry Schroerluke for Interveners and Appellants.

Nichols, Catterton & Downing, Merton R. Downing and Dyer B. Pierson for Plaintiff and Respondent.

OPINION

BROWN (H. C.), J.—This is an appeal from a judgment enjoining the City of Berkeley (hereinafter referred to as "City") and its director of department of parks and recreation from interfering with the use of certain lawn bowling greens in the City by the Berkeley Lawn Bowling Club (here-

inafter referred to as "Club"). As will appear, we have concluded that the trial court correctly ruled in the Club's favor and that the judgment should be affirmed.

On August 22, 1963, the Club and the City entered into an agreement whereby the Club agreed to lease a clubhouse to be constructed by the City on City property at an estimated cost of $30,000. In consideration thereof, the Club agreed to pay $15,000 down and one-tenth of the balance of the construction cost of the clubhouse on an annual basis over a 10-year period. During the second 10-year period of the lease, the Club agreed to pay a rental of $600 per year. The Club further agreed that the clubhouse should be used by the Club solely as a lawn bowling clubhouse; that the Club would represent the City in lawn bowling activities; and that the Club would foster and promote lawn bowling activities in the City.

The lease made no mention of the maintenance of the bowling greens themselves, although they had been the subject of written agreements between the City and the Club in the past. The trial court found, and it is not disputed, that the first of a series of agreements between the Club and the City was entered into on September 25, 1930. At that time, the City granted the Club and its members the right and privilege of using the one lawn bowling green then in existence, sharing that right of use with the public, and granted the Club the use of space in a City building as a clubhouse at an annual rent of $150. Agreements similar in nature were signed at intervals with the last one extending for a term ending October 1, 1964.

The first lawn bowling green was completed in approximately 1930. Pursuant to an agreement dated August 9, 1960, between City and Club, the City constructed a second lawn bowling green and the Club paid $8,000 toward the cost of construction of approximately $18,000. Shortly after the completion of the second lawn bowling green, negotiations were entered into between Club and the City for construction of the clubhouse. Participating in these negotiations were Mr. Saalwachter, director of parks and recreation in Berkeley, Mr. Hunrick, assistant city manager, and Mr. Schuyler, representing the Club. These three men testified at the hearing that the discussions centered primarily around the construction of the proposed clubhouse, the possibility of future construction of a third green, hours of use for greens and clubhouse, maintenance level of the greens and the general subject of stimulating further interest in lawn bowling. There was no suggestion that the City would not continue its past role of physical maintenance of the greens and the expense of that maintenance.

Since the execution of the lease, the Club has administered the use of the bowling greens and supervised the play on the greens as it had in the past. Membership in the Club has increased from approximately 90 in 1958

to approximately 170 at the time of the hearing. Membership is open to anyone, although the sport in general attracts older people. The Club maintains a membership committee which has been active in recruiting members and a coaching committee which instructs beginners. The Club provides all supplies for beginners other than shoes.

On March 27, 1972, the City Council of Berkeley declared its intention to immediately convert the north green into a minipark and designate the south green as a public bowling facility. In a year's time, the council would then review the use to be made of the land occupied by the south green. This action followed a citizens' petition within the neighborhood in which the bowling greens are located and a determination that this land was the only neighborhood land available for a multi-purpose recreational area.

The trial court in considering the Club's action for injunctive relief found that "It was the intent of both the CLUB and the CITY and the principal inducement for the construction of the Clubhouse that both bowling greens should remain adjacent to the Clubhouse and be available to CLUB members through the term of the said lease.

"That either through oversight or by tacit agreement the CLUB's right to use the two lawn bowling greens was neither explicitly set forth in the said Clubhouse lease nor expressed in any further renewal agreements of any such rights at the expiration of the last greens use agreement."

The court then concluded "That plaintiff should be granted a Permanent Injunction against defendants, CITY OF BERKELEY, and WALTER TONEY, prohibiting the destruction of either of the two lawn bowling greens or harm to either green or other interference with the plaintiff's use and supervision of said greens, in the manner that plaintiff has used and supervised said bowling greens from the time of the completion of the second bowling green to date hereof."

■ We do not agree with appellant's argument that there is insufficient evidence to support the finding that the 1963 lease was subject to an implied covenant which obligates the City to maintain the two bowling greens. "In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing." (*Universal Sales Corp.* v. *Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 771 [128 P.2d 665].) "This covenant not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty

to do everything that the contract presupposes that he will do to accomplish its purpose. (Citations.)" (*Harm* v. *Frasher* (1960) 181 Cal.App.2d 405, 417 [5 Cal.Rptr. 367].)

The trial judge clearly recognized this principle of law when he stated in his memorandum of decision the following: "Thus, the court has concluded that it was the intent of the parties, and the principal inducement to the construction contract, that both bowling greens should remain adjacent to the clubhouse and available to club members throughout the term of the clubhouse agreement, and that either through oversight or by tacit agreement the Club's right to use of the greens was neither explicitly set out in the clubhouse lease nor embraced in any further renewal agreements at the expiration of the latest green use agreement. And if that was not, in fact, the intent of the City—if the City cherished a secret and undisclosed intent to withdraw the greens while encouraging the Club to commit itself to paying for clubhouse construction—the City should be estopped from taking advantage of the Club's vulnerability. This is equally true today as it would have been had the City attempted to change its position by removing one or both greens immediately after inducing the Club to pay for the clubhouse, as the passage of years has only lessened the enormity and not the nature of such a wrong."

Appellant's arguments against imposition of an implied covenant in the agreement between the Club and the City are without merit. Appellant's position is that the Club has what it bargained for, the use of the clubhouse. From the fact, however, that the only use to which the clubhouse may be put is to facilitate lawn bowling and the only lawn bowling greens available are those involved in this dispute, it is inescapable that the Club cannot receive the intended benefit from the contract unless the bowling greens remain in existence. There is no evidence presented suggesting that the Club and City contemplated any other use of the clubhouse and the lease itself clearly provides for this exclusive use. It is a reasonable inference from the evidence, in fact the only reasonable inference, that the parties intended that the arrangements they had followed for 30 years should continue.

■ Interveners contend that the Club has no legally protectable interest for the reason that the Club pays no possessory interest tax. Contract rights are no less protectable because they are not subject to a possessory tax.

■ In its reply brief, interveners argue that the implied covenant to maintain the greens is invalid as an improper delegation of legislative authority and attempt to apply principles articulated in *County of San Diego* v. *Cal. Water etc. Co.* (1947) 30 Cal.2d 817 [186 P.2d 124, 175 A.L.R.

747], a case inapposite to the problem before this court. In *County of San Diego*, the court stated "that neither the doctrine of estoppel nor any other equitable principle may be invoked against a governmental body where it would operate to defeat the effective operation of a policy adopted to protect the public." (At p. 826.) The court therein was involved with the exclusive statutory procedure by which public roads may be abandoned. There is no statutory procedure which would be violated here by allowing the Club to continue to supervise and use the greens as it has done for a number of years.

Interveners suggest throughout their briefs that the imposition of an implied covenant here would give exclusive rights to a private special interest group. Evidence was presented, however, that the Club's membership is open to all who wish to join and that no one applying has been excluded. The self-interest to which the interveners refer is no more pernicious to the public good than is any other interest in a sport shared by some but not all of the public.

As an alternative theory for its holding in this case, the trial court found that the City was estopped to deny the Club the nonexclusive right and privilege to the use of the two lawn bowling greens throughout the term of the lease. We also agree with this holding.

"The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 496-497 [91 Cal.Rptr. 23, 476 P.2d 423]; see also *Harbach* v. *El Pueblo de Los Angeles etc. Com.* (1971) 14 Cal.App.3d 828, 834-835 [92 Cal.Rptr. 757].) Whether the elements of an estoppel exist "is generally a question of fact for the trial court whose determination is conclusive on appeal unless the opposite conclusion is the only one that can be reasonably drawn from the evidence." (*Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245].)

The City argues that estoppel is an improper theory upon which to hold it to the maintenance of the bowling greens because nowhere can the Club point to an action or statement which would have led the Club to believe that the City was making a commitment. The basis for the estoppel here is similar in concept to that in *People* ex rel. *Dept. Pub. Wks.* v. *Volz* (1972) 25 Cal.App.3d 480 [102 Cal.Rptr. 107], where the court found that

the state had induced landowners' ignorance of the state's intention. (See 25 Cal.App.3d at p. 488.) Here, the basis of the trial court's ruling was the Club's induced ignorance of the City's intention to retain the power to destroy the lawn bowling greens when it saw fit. This ignorance was induced by the City's action in executing the clubhouse agreement without informing the Club of its intention as to the greens while maintaining its previous role with regard to the greens.

■ "Elements of estoppel are (1) awareness of the party to be estopped; (2) his intention that his conduct be acted upon; (3) the second party's ignorance of the facts; and (4) the latter's reliance upon the conduct and consequent injury. (Citation.)" (*People* ex rel. *Dept. Pub. Wks.* v. *Volz, supra,* at p. 488.) ■ As the trial court pointed out, the estoppel theory is an alternate theory countering the City's contention that it did not intend to maintain the greens during the term of the lease and deliberately did not include the subject in the lease agreement. Assuming this to be true, it is clear that all elements of an estoppel are met. The City, by its own admission, was aware of all the facts as they existed at the time of the agreement. There was substantial evidence that the Club did not know the City contemplated the possibility of closing the greens or changing their operation in any way. From the evidence, the court could also find that the City intended the Club to act as it did in signing the agreement and that the Club relied, to its detriment, by obligating itself financially for the construction of the clubhouse.

Nor do we discern any public policy or interest which would suffer a deleterious effect by the raising of an estoppel in this case. Often such a public policy is reflected by statutory regulations which would be required to yield by the raising of an estoppel. (See, e.g., *County of San Diego* v. *Cal. Water etc. Co., supra,* 30 Cal.2d 817; *Pettitt* v. *City of Fresno* (1973) 34 Cal.App.3d 813 [110 Cal.Rptr. 262]; *Santa Monica Unified Sch. Dist.* v. *Persh* (1970) 5 Cal.App.3d 945 [85 Cal.Rptr. 463].) Here, there are no statutory requirements which would be violated by inclusion of an agreement to preserve and maintain the greens in the lease. Nor is our attention drawn to any prohibition against the 20-year lease itself. The conflict here seems limited to the interest of two groups of citizens. The public interest, which will prevent the raising of an estoppel, obviously cannot be determined by strength of numbers alone.

■ Interveners argue that this is not a proper case for injunctive relief because the consideration for the contract was inadequate, the cost of enforcing the mandatory order is excessive and the damages are readily ascertainable.

■ In answering these arguments, as well as the contention later dealt with that the injunction is too broad, the Club complains of unfairness in that the interveners were allowed to intervene after an ex parte motion and have broadened the issues of the case. The Club's points are not well taken. If the Club wished to challenge the intervention of this citizen's group, they could have done so by demurring to the sufficiency of the complaint in intervention or by a motion to strike such complaint. (See 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 198, pp. 1872-1873.) Having made no objection below, the Club has waived any error in permitting the intervention. (*Bloom* v. *Waxman* (1941) 48 Cal.App.2d 646 [120 P.2d 509].) Nor have the interveners extended the issues between the parties by attacking the propriety of the injunction. This was the relief requested by the Club. It was challenged below by the interveners and may be challenged here.

■ Section 3391 of the California Civil Code provides, in part, that specific performance cannot be enforced against a party to a contract if he has not received an adequate consideration for the contract and if it is not, as to him, just and reasonable. A challenge based on these principles must be considered in view of the entire circumstances (*Wilson* v. *White* (1911) 161 Cal. 453, 465 [119 P. 895]), including the object to be obtained by the contract and the relationship of the parties and must be determined as of the time the contract was made. (*Henderson* v. *Fisher* (1965) 236 Cal. App.2d 468, 474 [46 Cal.Rptr. 173]; *County of Los Angeles* v. *Law Bldg. Corp.* (1967) 254 Cal.App.2d 848, 856 [62 Cal.Rptr. 542].) Interveners point out that the cost of maintaining the greens is large. The City has spent approximately $99,590 in maintenance since 1961 and the yearly cost will undoubtedly rise as the years go on. In return, the Club has paid only construction cost of $30,000 over the first 10 years of the lease and a rental of $600 for each of the remaining 10 years of the contract. At the time the contract was made, any disparity in dollar amounts would be much less. More importantly, however, the City has received, and will continue to receive, not only the rental but the supervision and expertise of the Club which, according to the testimony of the witnesses, is essential to the sport of lawn bowling. The object of the contract was to establish a lawn bowling complex and to provide a form of recreation for its citizens. Interveners have not demonstrated that the means chosen to achieve these goals were unreasonable or unfair.

Nor do the interveners more persuasively attack the findings that lead to the conclusion that damages would be inadequate. The court found that the monetary detriment to the Club of reducing bowling facilities by one half cannot be determined; decrease in membership could not be reliably

estimated nor could it be determined if the remaining members could financially support the clubhouse. These findings find support in the testimony of Mr. Wellman, vice president of the Club. Moreover, refusal of injunctive relief would mean that participation in the sport would be curtailed or eliminated. Interveners do not suggest a means to measure this loss to those individuals affected.

Nor do they suggest a means of measuring in dollars the value of the service rendered by the various members in soliciting and obtaining funds for the construction of the building or the work of members on the various committees in carrying out the obligations of the contract.

Interveners also attack the trial court's order for vagueness and overbreadth, raising the spectre of a City uncertain as to the implications of deciding to change its schedule for watering the greens or allowing other than Club members to use the greens. The order's meaning, however, is clear in the context of the past relationship between the Club and City and the action of the City which gave rise to the present conflict. Viewed in context, the order obviously means that the City is not to carry forth its intentions regarding the greens, which were expressed on March 7, 1972, and should maintain the status quo as to Club's and City's right and obligations as regards the bowling greens.

A judgment need not contemplate all contingencies or problems (see *Hucke* v. *Kader* (1952) 109 Cal.App.2d 224, 229 [240 P.2d 434].) In the event that difficulties arise, the trial court will have the power to modify or dissolve its injunction. (*Woods* v. *Corsey* (1948) 89 Cal.App.2d 105, 113 [200 P.2d 208].)

In addition to vagueness of the order, interveners complain that part of the injunction which mentions the Club's supervision of the greens should be dissolved as the prayer of the Club did not include a request for such an order. Code of Civil Procedure section 580 provides that if a defendant answers, the court may grant "any relief consistent with the case made by the complaint and embraced within the issue." Supervision was shown by the evidence to be necessary to the use of the greens which, without supervision of play, could be rendered useless for lawn bowling. The relief was clearly within the issues and consistent with the case made by the complaint.

The judgment is affirmed.

Draper, P. J., and Devine, J.,* concurred.

Petitions for a rehearing were denied November 1, 1974, and the petitions of all the appellants for a hearing by the Supreme Court were denied November 27, 1974.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.