127 Cal.Rptr.2d 696 (2002)
104 Cal.App.4th 1
Eugene EVANS et al., Plaintiffs and Appellants,
v.
CITY OF BERKELEY et al., Defendants and Respondents.
No. A097187.
Court of Appeal, First District, Division Five.
November 25, 2002.
review Granted March 26, 2003.
*698 Jonathan D. Gordon, Pleasant Hill, for Plaintiffs and Appellants.
Manuela Albuquerque, City Attorney, Matthew J. Orebic, Laura McKinney, Deputy City Attorneys, for Defendants and Respondents.
Brad W. Dacus, Roger G. Ho, Pacific Justice Institute, John H. Findley, Sacramento, Harold E. Johnson, Pacific Legal Foundation, for amicus curiae on behalf of Appellants.
*697 STEVENS, J.
Appellants challenge a judgment dismissing their action against respondent City of Berkeley. Appellants contend the trial court erroneously sustained a demurrer to their amended complaint, which challenged respondent's termination of a program under which appellants were allowed to berth their boats, rent free, at the Berkeley Marina. Appellants maintain the decision to end this subsidy of free rent for their boat berths violated their contractual rights, First Amendment rights, civil rights, and equal protection rights. We affirm the trial court's judgment.

I. FACTS AND PROCEDURAL HISTORY

Appellants identify themselves as members or affiliates of an unincorporated association of Sea Scouts, a group which is affiliated with the Boy Scouts of America. For many decades appellants had moored their boats, rent free, at the Berkeley Marina, which is owned by respondent City of Berkeley (Berkeley).
In 1997, Berkeley enacted a city policy, as stated in Berkeley City resolution No. 58,859-N.S., which forbids the use of city funds to subsidize the activities of private groups using city property at the marina, if those groups discriminate against individuals on grounds of race, sex, national origin, religion or lack thereof, sexual orientation, and other grounds.[1] In May of 1998, Berkeley informed appellants they could no longer berth their boats for free at the marina, unless they expressly abandoned any policy of discriminating against gays or atheists. Appellants declined to specifically comply with this requirement,[2] *699 and their free rent subsidy was ended. However, even in the absence of compliance with the nondiscrimination program, appellants were permitted to maintain their boats berthed at the marina, for a fee, as other members of the public are allowed to do. Appellants were required to pay an additional $433 per month to berth their large vessel, the Farallon, as they continued to do.
Appellants, a group of individual Sea Scouts, brought this action alleging Berkeley had, inter alia, breached their contractual rights, and violated their First Amendment rights, civil rights, and equal protection rights.
Berkeley initially removed the action to federal court. However, United States District Judge Susan Illston ordered that the matter should be remanded to state court on procedural grounds, since one of the individual defendants who had been served was not joined in the removal petition.
Berkeley filed a demurrer to appellants' various causes of action in the Alameda Superior Court. The court construed Berkeley's demurrer as a motion for judgment on the pleadings, and granted it with leave to amend. Appellants filed an amended complaint, with almost identical claims.
Berkeley then filed a further demurrer, to all claims in the amended complaint. The trial court sustained Berkeley's demurrer without leave to amend, ruling that: (1) appellants had no valid contract with Berkeley requiring the city to abstain from charging appellants rent or enforcing its nondiscrimination policy; and (2) appellants were not deprived of their First Amendment rights, civil rights, or equal protection rights, and they were treated the same as any other group that discriminates. The trial court did not reach another issue, Berkeley's argument that appellants as individuals had no standing to assert the rights of the Berkeley Sea Scouts organization. A judgment of dismissal was entered, and appellants brought this appeal.

II. DISCUSSION

A. Standard of review
Initially, the parties to this appeal dispute the proper standard of review. Berkeley suggests we may only reverse the judgment of dismissal if the trial court abused its discretion in denying leave to amend, while appellants argue we must exercise de novo review.
Appellants are correct on this issue. On appeal from a judgment of dismissal following an order sustaining a demurrer without leave to amend, we examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory. (McCall v. PacifiCare of Cal, Inc. (2001) 25 Cal.4th 412, 415, 106 Cal.Rptr.2d 271, 21 P.3d 1189 (McCall).) We assume the truth of all material facts properly pleaded, as well as facts that may be implied or inferred from those expressly alleged. (Rose v. Royal Ins. Co. (1991) 2 Cal.App.4th 709, 716, 3 Cal.Rptr.2d 483.)

B. THE TRIAL COURT'S RULING WAS CORRECT.
On de novo review, we conclude appellants have not pled legally valid claims for breach of contract or similar quasi-contractual claims such as estoppel. Nor have they stated a cause of action based upon violations of their First Amendment rights, civil rights, or equal protection rights.

*700 1. Contract Claims

Appellants, in their first three causes of action, attempt to assert claims for breach of a written contract and a covenant implied into such a contract (first cause of action); an oral contract (second cause of action); and estoppel (third cause of action). Appellants based these claims on prior resolutions of the city council dating from 1945 and 1969, which had favored the goals of scouting and the Sea Scouts. Those resolutions allowed the Sea Scouts organization to enjoy a waiver of fees for berthing boats, after the Boy Scouts of America granted Berkeley permission to use rocks from a Boy Scout camp to create fill at the marina during the late 1930's and early 1940's, in an informal accommodation referred to by appellants as the "rocks for docks" deal.
However, no lease or contract rights were granted by the resolutions, which provided at most only a permit, subject to Berkeley's rules and regulations and also subject to cancellation on 30 days' notice. The first, 1945 resolution, No. 27,738, reads in pertinent part: "WHEREAS, the Boy Scouts of America have filed a request for the use without charge of one open berth and mooring facilities for seven boats in the Berkeley Yacht Harbor; ... [¶] ... [¶] NOW, THEREFORE, Be it Resolved that the Boy Scouts of America are hereby granted the use without charge of one berth and mooring facilities for seven boats to be designated by the Harbormaster. [¶] RESOLVED FURTHER, that said berth and mooring facilities shall be used by the Boy Scouts of America in accordance with all rules and regulations established by the City of Berkeley relative to the Berkeley Yacht Harbor, and said permission herein granted is subject to revocation by a 30 day written notice." Similarly, the second, 1969 resolution, No. 42,885 provided a permit for six berths, two dry storage spaces, and one dock locker, without charge, but also stated: "The City of Berkeley reserves the right to revoke this permit at any time upon thirty (30) days written notice...."
Significantly, appellants'"contract" claims do not arise from any explicit contractual language made enforceable under the Berkeley city charter, but arise from the language of the two resolutions of the city council, which could be changed, modified, or limited prospectively in the future, as Berkeley has done. In fact, the resolutions appellants rely on specifically state that the program allowing free rent for boat berths was subject to all rules and regulations regarding marina facilities, and could be terminated at any time, on 30 days' notice. Appellants do not contend they were not given 30 days' notice of the requirement to pay rent in the future, and the purported "contract" created by the resolutions contained no substantive terms which would establish Berkeley breached such a "contract." Berkeley's demurrer to such claims was therefore properly sustained. (See McCall, supra, 25 Cal.4th at p. 415, 106 Cal.Rptr.2d 271, 21 P.3d 1189.)
Appellants' contract or quasi contract claims are also infirm on another closely related ground. There was no contract complying with the formal requirements of section 65 of the Berkeley city charter.[3] To create an enforceable contract with Berkeley, the city charter requires authorized execution by a city officer and approval *701 by countersignature of the city auditor. This requirement was not met. (See San Francisco Internal Yachting etc. Group v. City and County of San Francisco (1992) 9 Cal.App.4th 672, 683-684, 12 Cal.Rptr.2d 25 [Per Haning, J., in the absence of a signed contract complying with the formal requirements of a city charter, no binding contract existed; the demurrer was properly sustained.] (San Francisco Internal Yachting).) Neither of the two resolutions was ever approved as a binding contract by the authorized signature of an officer and the city auditor, as the Berkeley city charter requires, and the very language of the resolutions shows that the city council did not intend to create contractual rights enforceable in perpetuity. (See ibid.)[4]
For similar reasons, the trial court sustained the demurrer to the appellants' third cause of action for "estoppel." Such an estoppel cannot arise when the formal requirements for a city contract specified in a municipal charter are not met. (See San Francisco Internal Yachting, supra, 9 Cal.App.4th at pp. 683-684, 12 Cal. Rptr.2d 25.) We distinguish in this regard the case of Berkeley Lawn Bowling Club v. City of Berkeley (1974) 42 Cal.App.3d 280, 285-289, 116 Cal.Rptr. 762 (Berkeley Lawn Bowling), relied on by appellants. There, the court was called upon to interpret a series of written leases and other written agreements between Berkeley and a private group of lawn bowling enthusiasts. Questions surrounding the lack of a written agreement authorized under the Berkeley city charter were simply never addressed.
In addition, we find that appellants did not plead the requirements for such an estoppel, as the trial court pointed out. (Cf. Berkeley Lawn Bowling, supra, 42 Cal.App.3d at pp. 285-289, 116 Cal.Rptr. 762 [Lawn bowlers had detrimentally relied on written agreements with Berkeley concerning construction of a club house next to city-maintained bowling greens].) Although appellants had received more than 50 years of rent-free boat berthing, they could not plead detrimental reliance since the Berkeley resolutions providing this free rent arrangement were not formal written contracts and could be terminated at any time on 30 days' notice, could always be altered, or could be limited by subsequent resolutions or other legislation. (Cf.ibid.)
We therefore agree that appellants presented no valid claim of breach of any contractual rights or estoppel, nor could they amend their complaint to do so. The trial court properly sustained the demurrer to these causes of action. (See McCall, supra, 25 Cal.4th at p. 415, 106 Cal.Rptr.2d 271, 21 P.3d 1189.)

2. Appellants Were Not Deprived of Their First Amendment Rights.

Appellants, joined by the amici Pacific Legal Foundation and Pacific Justice Institute, who have filed amicus briefs with our permission, next maintain that their free speech and free association rights were violated by the decision of Berkeley to end *702 the city subsidy of free rent for appellants' boat berths. This argument is also unconvincing.
In the fourth cause of action of the amended complaint, appellants allege Berkeley violated their civil rights under the state Unruh Civil Rights Act, Civil Code section 51 et seq., by infringing their right to free speech, free association, and equal protection. In the fifth and final cause of action, appellants also assert similar claims of deprivation of their First Amendment and other constitutional rights, under the provisions of 42 United States Code section 1983.[5]
Appellants did not and could not plead a cause of action based upon the deprivation of their First Amendment rights. They were treated the same as any other private citizens or groups who desire to rent berths at the marina, and must pay a rental fee. Appellants did not qualify for a city subsidy, free rent, which is made available to some nonprofit, nondiscriminating groups, because they declined to adhere to Berkeley's nondiscrimination policy. Appellants thus remained free to exercise their First Amendment rights, and berth their boats at the marina, albeit without a city subsidy. Berkeley's actions have not required appellants to stop discriminating in these regards, which they remain free to do.
The present case therefore does not involve an order to cease discrimination; nor does it involve a denial of access to a public forum, or public employment, public benefits provided to all citizens by law, or public property, based upon the content of speech or a particular desire to associate, as in the cases cited by appellants and amici. (Cf. Boy Scouts of America v. Dale (2000) 530 U.S. 640, 659, 120 S.Ct. 2446, 147 L.Ed.2d 554 [Boy Scouts were improperly ordered to cease discriminating under state law.] (Boy Scouts of America); Lamb's Chapel v. Center Moriches Union Free School Dist. (1993) 508 U.S. 384, 394-397, 113 S.Ct. 2141, 124 L.Ed.2d 352 [Religious group could not be forbidden to show a certain film on public property, merely because the film had a religious viewpoint]; Rosenberger v. Rector and Visitors of the Univ. of VA (1995) 515 U.S. 819, 837, 115 S.Ct. 2510, 132 L.Ed.2d 700 [Public university could not deny access to university funding for a religious organization's newspaper based on its viewpoint, while granting such funding to all other viewpoints.]; Perry v. Sindermann (1972) 408 U.S. 593, 596-597, 92 S.Ct. 2694, 33 L.Ed.2d 570 [Public employment could not be denied to a particular person, based upon his speech or political views.]; Sherbert v. Vemer (1963) 374 U.S. 398, 404-05, 83 S.Ct. 1790, 10 L.Ed.2d 965 [Public unemployment benefits made available to all qualifying employees could not be denied based upon an applicant's religious views.]; Torcaso v. Watkins (1961) 367 U.S. 488, 495-496, 81 S.Ct. 1680, 6 L.Ed.2d 982 [Public employment could not be reserved for those willing to sign a declaration that they believed in God.]; Speiser v. Randall (1958) 357 U.S. 513, 529, 78 S.Ct. 1332, 2 L.Ed.2d 1460 [California could not require a taxpayer's signature on a loyalty oath as part of a tax filing.].) The rationale of these cited cases, with which we concur, is that the state may not order, forbid, or require a particular type of political or religious speech or association in order to favor or disfavor a particular viewpoint.
However, Berkeley has not attempted to muzzle anyone's speech, and Berkeley has *703 not ordered appellants to cease discriminating or associating as they please. Berkeley has only prevented appellants from enjoying a certain city subsidy, free rent, unless appellants' program is open to all residents without regard to the barriers created by the types of invidious discrimination Berkeley seeks to discourage. The federal Supreme Court and the California Supreme Court have held and indicated that the use of such a criterion of nondiscrimination for a public subsidy, intended for private nonprofit organizations open to all persons, would not violate the free speech rights of private discriminating organizations not qualifying for the subsidy. (Grove City College v. Bell (1984) 465 U.S. 555, 575-576, 104 S.Ct. 1211, 79 L.Ed.2d 516 [A subsidy conditioned on compliance with antidiscrimination goals did not violate the First Amendment rights of a noncomplying college.] (Grove City ); accord, Bob Jones University v. United States (1983) 461 U.S. 574, 602-604, 103 S.Ct. 2017, 76 L.Ed.2d 157 [Government may condition a subsidy created by tax exempt status on a lack of illegal discrimination by nonprofit organizations.] (Bob Jones); Regan v. Taxation With Representation of Wash. (1983) 461 U.S. 540, 549, 103 S.Ct. 1997, 76 L.Ed.2d 129 [Subsidy under tax laws for nonprofit organizations could be conditioned upon limitations on their exercise of their First Amendment rights.] (Regan); Curran v. Mount Diablo Council of the Boy Scouts (1998) 17 Cal.4th 670, 701, 72 Cal.Rptr.2d 410, 952 P.2d 218 [Tax exempt subsidy status could be removed from the Boy Scouts, if they engaged in forbidden discrimination.] (Curran).)
Thus, it has uniformly and repeatedly been held permissible to condition a public subsidy on compliance with nondiscrimination policies. For example, Grove City, supra, dealt with a public subsidy provided to certain colleges to defray or supplement the tuition paid by students. The subsidy was conditioned on compliance with an antidiscrimination policy, requiring the colleges to agree not to discriminate against students based on protected status, including sex. One college and its students argued that this condition or restriction on the subsidy violated the First Amendment rights of the college and its students, including their right of association. The federal Supreme Court unanimously rejected this argument: "Requiring Grove City to comply with Title IX's prohibition of discrimination as a condition for its continued eligibility to participate in the [subsidy] program infringes no First Amendment rights of the College or its students." (Grove City, supra, 465 U.S. at pp. 575-576, 104 S.Ct. 1211.) Similarly, in our case, a nondiscrimination condition on the public subsidy of free boat berths does not violate the First Amendment rights of appellants.
In Bob Jones, supra, 461 U.S. at pages 603-604, 103 S.Ct. 2017 the federal Supreme Court dealt with a nondiscrimination condition which had been attached to the federal tax law requirement of charitable status, allowing favorable tax treatment of nonprofit foundations. A university contended its First Amendment right to freedom of religion had been violated by this condition, requiring it to cease discriminating in order to receive the subsidy of favorable tax status. The federal Supreme Court rejected this argument, observing that denial of a tax subsidy did not violate any First Amendment rights, because the university remained free to observe its own religious principles in favor of discrimination, albeit without a subsidy: "Denial of tax benefits will inevitably have a substantial impact on the operation of private religious schools, but will not prevent those schools from observing their religious tenets." (Ibid.) Likewise, in the present case Berkeley has not prevented *704 appellants from associating as they please; it has simply prevented them from collecting a subsidy, unless they agree not to discriminate.
Similarly, in Regan, supra, 461 U.S. at page 549, 103 S.Ct. 1997 a subsidy under certain federal tax laws was made available to nonprofit organizations, but only on the condition that they not exercise their First Amendment rights in certain ways. The high court ruled (per Rehnquist, J.) that even though the right in question was protected by the First Amendment, this public subsidy could validly be conditioned upon an agreement by the recipient organizations that they would not exercise these First Amendment rights, because the mere "decision not to subsidize the exercise of a fundamental right does not infringe the right...."
More recently, the California Supreme Court ruled, in Curran, supra, 17 Cal.4th at page 701, 72 Cal.Rptr.2d 410, 952 P.2d 218, that the Boy Scouts of America was not a "business establishment" of the type that could be ordered not to discriminate under California's Unruh Civil Rights Act; however, the high court also indicated a subsidy such as tax exempt status could be removed from the Boy Scouts, if they engaged in forbidden discrimination. "To begin with, even though the provisions of the Unruh Civil Rights Act do not apply to the membership policies of the Boy Scouts, it does not follow, as the trial court assumed, that the Boy Scouts are therefore free to exclude boys from membership on the basis of race, or on other constitutionally suspect grounds, with impunity. The Unruh Civil Rights Act is not the only legislative measure that is aimed at curbing discrimination on the basis of race, and in other contexts courts have upheld the imposition of a variety of sanctionsincluding the denial of tax-exempt status upon an otherwise qualified nonprofit entity that engages in racial discrimination. (See, e.g., Bob Jones University v. United States (1983) 461 U.S. 574 [103 S.Ct. 2017, 76 L.Ed.2d 157]....)" (Curran, supra, at p. 701, 72 Cal.Rptr.2d 410, 952 P.2d 218.) Similarly, Berkeley has not ordered or required appellants or the Boy Scouts to cease discriminating, but instead conditioned a city subsidy on compliance with nondiscrimination principles.
The case law from higher courts uniformly supports Berkeley's conditioning of a subsidy upon adherence to such nondiscrimination principles.[6] We are bound by *705 these rulings and follow them. {Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937.) The trial court properly sustained respondent's demurrers to these First Amendment claims. (See McCall, supra, 25 Cal.4th at p. 415, 106 Cal. Rptr.2d 271, 21 P.3d 1189.)

3. Other Issues

Appellants maintain their partial willingness to comply with the city's nondiscrimination policy, through a form of "don't ask, don't tell" compromise, should have been enough to establish compliance with the Berkeley nondiscrimination policy, and they contend their rights were violated by Berkeley's insistence on more stringent nondiscriminatory language. However, the requirement that appellants explicitly agree to comply with Berkeley city policy, by specifically agreeing not to discriminate against those persons of whose sexual orientation appellants become aware, did not violate appellants' First Amendment rights, since it was merely a permissible and reasonable condition placed upon receipt of a public subsidy. (See Grove City, supra, 465 U.S. at pp. 575-576, 104 S.Ct. 1211.)
Appellants also suggest they are being penalized for exercising their First Amendment rights in deciding to associate with certain persons or groups, including the national Boy Scouts of America organization, and appellants contend they are being punished for declining to protest against the discriminatory policies of the national scouting organization. However, Berkeley never required appellants to cease associating, engage in protest or speech, or do anything in those respects in order to receive a subsidy. The only thing appellants had to do to receive a subsidy was to agree to comply in the future with Berkeley's nondiscrimination policy. Appellants did not agree, apparently because the national scouting organization was providing low cost marine insurance, and would not permit appellants to so agree. This does not show any violation of appellants' First Amendment rights by Berkeley, which could require compliance with antidiscrimination policies from those receiving a city subsidy. (See Grove City, supra, 465 U.S. at pp. 575-576, 104 S.Ct. 1211.)
Further, there is no merit to appellants' related claims that their civil rights or equal protection rights were violated. Appellants were not denied any of the rights enjoyed by other citizens, i.e., the right of free speech and association, the right to due process, or even the specific right to use the marina, for a regular fee. Appellants were treated the same as other private parties who receive no rent subsidy from the city, and who need not agree to comply with the Berkeley policy against discrimination.
Although other nonprofit groups may qualify for a subsidy, should they comply with Berkeley City resolution No. 58,859-N.S., this does not demonstrate a denial of equal protection as to appellants, because they are not similarly situated. (See Maker v. Roe (1977) 432 U.S. 464, 470-477, 97 S.Ct. 2376, 53 L.Ed.2d 484 [state's decision to fund pregnancy-related medical expenses, but not abortions, did not violate the equal protection rights of those who did not qualify for a subsidy because they desired to exercise their protected right to end their pregnancies.].) Appellants had not agreed to comply with the Berkeley nondiscrimination policy, so they were obviously not similarly situated with those other organizations who agreed to comply. (See ibid.; Grove City, supra, 465 U.S. at pp. 575-576,104 S.Ct. 1211.)
Finally, appellants insist they had First Amendment rights to associate or speak with whomever they pleased, and *706 they claim Berkeley has penalized those rights, by removing the subsidy of free rent for their boat berths. It is true that appellants' decision not to comply with Berkeley's antidiscrimination conditions would arguably be protected in other contexts by the First Amendment. (See Boy Scouts of America, supra, 530 U.S. at p. 659, 120 S.Ct. 2446 [state could not simply order an end to certain types of discrimination]; Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc. (1995) 515 U.S. 557, 567-581,115 S.Ct. 2338, 132 L.Ed.2d 487 [state could not order organizations to include other groups in a parade].) However, this does not mean Berkeley would be required by equal protection or First Amendment principles to automatically grant appellants the public subsidy of free rent on boat berths, which was intended for those who agree to comply with the nondiscrimination conditions placed on this public subsidy. (See Grove City, supra, 465 U.S. at pp. 575-576, 104 S.Ct. 1211; Regan, supra, 461 U.S. at p. 549,103 S.Ct. 1997.)
The trial court's judgment of dismissal, following its ruling sustaining the demurrer, is affirmed as to all of appellants' claims. (See McCall, supra, 25 Cal.4th at p. 415, 106 Cal.Rptr.2d 271, 21 P.3d 1189.)[7]

III. DISPOSITION

The judgment of dismissal is affirmed.
We concur: JONES, P.J., and GEMELLO, J.
NOTES
[1] The resolution states, in pertinent part: "The Berkeley Marina advocates and practices equal opportunity in terms of access to its berthing facilities. Availability and use of the facilities will not be predicated on a person's race, color, religion, ethnicity, national origin, age, sex, sexual orientation, marital status, political affiliation, disability or medical condition." The Berkeley Municipal Code, section 13.28.060, also prevents Berkeley from discriminating based on sexual orientation in the provision of all city services.
[2] Appellants did agree to a modified version of a "don't ask, don't tell" program, in which appellants stated that they considered such matters as sexual orientation to be a private matter, which they would not ask anyone to divulge, and appellants agreed to obey any laws actually forbidding them from engaging in any illegal discrimination. Appellants also pointed out that some of their participants in the past had been persons who were atheists or who had presumably not been heterosexuals, and appellants had not discriminated against those persons. However, appellants did not and could not agree not to discriminate on these grounds in the future, because the Boy Scouts of America would not allow appellants to agree to such conditions without losing their Boy Scout charter, and appellants had to obey because they were securing their marine insurance at favorable rates through the Boy Scouts of America.
[3] Section 65 of the Berkeley city charter provides: "All contracts shall be drawn under the supervision of the City Attorney. All contracts must be in writing, executed in the name of the City of Berkeley by an officer or officers authorized to sign the same, and must be countersigned by the Auditor, who shall number and register the same in a book kept for that purpose."
[4] Appellants concede the resolutions were not approved and signed by the city auditor, as would be required for a contract binding on Berkeley under its charter, although appellants suggest we should find there was substantial compliance with other legal requirements. However, the fact remains the necessary formal requirements were not met, probably because no one at the time believed these resolutions created any contract rights. That assumption was correct, and the resolutions do not have any contractual terms which Berkeley breached, even if the other legal requirements for an enforceable contract had been met, which they were not. (See San Francisco Internat. Yachting, supra, 9 Cal.App.4th at pp. 683-684, 12 Cal. Rptr.2d 25.)
[5] 42 United States Code section 1983 provides, in pertinent part, that any persons deprived of their constitutional rights "under color of" any state statute or ordinance may bring suit for redress.
[6] For an interesting examination in greater depth of the possible constitutional problems created by governmental subsidies and the restrictions which may be placed on them, see the extensive discussion by Professor (now Dean) Kathleen M. Sullivan in Unconstitutional Conditions (1989) 102 Harv. L.Rev. 1415, 1499-1506. Among the questions raised by this article is the following: Why is it that governments may use conditions on subsidies, but not direct orders, to favor certain types of political goals affecting rights of free speech and association? Logically, perhaps, it is difficult to justify the existing distinction in the case law between the two types of governmental action. The full ramifications of this constitutional question may raise difficult theoretical issues which are beyond the scope of the present appeal, but no court has ever held governments may not provide or condition subsidies to favor groups adhering to genuine nondiscrimination goals, and the existing case law, cited in the text above, uniformly favors the constitutionality of similar restrictions on governmental subsidies. The reason for the distinction in the case law may lie only in the pragmatic observation that it is one thing to offer a subsidy to encourage a boat captain to take on passengers or crew, and quite another thing to order him to do so. Of course, public subsidies are usually granted in order to further some public purposes, and it would be a surprising result if subsidies were required to be paid to those who would not agree to comply with conditions designed to further those purposes. (See Grove City, supra, 465 U.S. at pp. 575-576, 104 S.Ct. 1211.)
[7] In light of these conclusions, rejecting appellants' claims on the merits, we need not reach the additional issue of whether the individual appellants had standing to pursue all of their contractual claims and other related claims. The trial court did not reach this issue, finding it moot. (Finnie v. Town of Tiburon (1988) 199 Cal.App.3d 1, 10, 244 Cal.Rptr. 581.)